[Civ. No. 13277. First Dist., Div. One. Apr. 21, 1947.]

JOSEPH VIGLI et al., Respondents, v. WILLIAM J. DAVIS et al., Appellants.

Phil F. Garvey and Julia M. Easley for Appellants.

Charles A. Christin and Thomas J. Keegan for Respondents.

BRAY, J.—Appeal by all defendants from an order granting plaintiffs' motion for a new trial, after a jury verdict in favor of defendants, in an action to recover an alleged secret profit while serving in the alleged capacity of real estate agents for plaintiffs.

The complaint alleged that William J. Davis, doing business as the Davis Realty Company, through his own employee, defendant Jay Brandell, acted as plaintiffs' agent in the sale

of their property to one Galant; that they were induced to sell their property at a lower price than that which Davis could have obtained; that Davis, without their knowledge, purchased the property from their grantees, resold it to the ultimate purchaser for a much larger price than they had obtained, thereby realizing a secret profit, for which profit the plaintiffs asked judgment.

Defendants' answer denied that any of the defendants other than defendant Brandell was the agent of plaintiffs in the sale transaction, and that any of the other defendants were employees of Davis, but alleged that these other defendants were independent real estate brokers; alleged that Brandell was plaintiffs' sole agent in the transaction, and that the property was sold in the ordinary course of business to Galant as a bona fide purchaser for value; and denied that any defendant was guilty of fraud or concealment. The jury found in favor of all defendants. The court granted plaintiffs' motion for a new trial, upon the ground of the insufficiency of the evidence to sustain the verdict.

Defendants' primary contention on appeal is that as matter of law there was insufficient evidence to justify a verdict in favor of plaintiffs had one been returned by the jury, for the reason that the evidence shows without contradiction that Brandell alone, and not Davis, was the agent of plaintiffs, and therefore the granting of a new trial constituted a clear abuse of discretion. Secondly, they contend that the sale by plaintiffs to Galant effected an equitable conversion of title to plaintiffs' property, and that by reason of such conversion, plaintiffs can legally have no interest in its subsequent disposition. Finally, they contend that plaintiffs had constructive knowledge of the subsequent transactions.

The test to be applied to the evidence on this appeal is as set forth in *Williams* v. *Field Transportation Co.*, 28 Cal.2d 696 [171 P.2d 722]. ''An order granting a new trial upon the ground of the insufficiency of the evidence to sustain the judgment will not be disturbed upon appeal, unless there be a clear showing of abuse of discretion. 'All presumptions are in favor of the order and it will be affirmed if it is sustainable on any ground. (*Mazzotta* v. *Los Angeles Ry. Corp.*, 25 Cal.2d 165, 169 [153 P.2d 338], and cases cited.) The trial court in considering a motion for new trial is not bound by a conflict in the evidence, and has not abused its discretion when there is any evidence which would support a judgment in

favor of the moving party.' (*Ballard* v. *Pacific Greyhound Lines,* 28 Cal.2d [357] [170 P.2d 465].) Even if the evidence is uncontradicted, the trial judge may draw inferences from it contrary to those made by the jury, and it is his duty to resolve such conflicts in determining whether the issues should be retried. Only when, as a matter of law, there is no substantial evidence to support a contrary judgment, may an appellate court reverse an order granting a new trial. (*Brooks* v. *Metropolitan Life Ins. Co.,* 27 Cal.2d 305 [163 P.2d 689] ; *Mazzotta* v. *Los Angeles Ry. Corp., supra.*)'' (See, also, *Estate of Sexton,* 199 Cal. 759 [251 P. 778].)

 Defendants admit that the foregoing is the rule, but contend that the evidence here is uncontradicted, basing this contention primarily on certain exhibits admitted in evidence. Unless we give to these exhibits the construction contended for by defendants, there was a decided conflict in the evidence. Disregarding, for the moment, defendant's contention as to these documents, and all conflicts in the evidence, and giving to plaintiffs' evidence the weight to which it is entitled in an appellate court, the evidence shows: Plaintiffs were the owners of an apartment house in San Francisco. About a year prior to the transactions here, defendant Brandell visited them and inquired if they were interested in selling their property. He told them that he was from the Davis Realty Company and presented them a card. (Plaintiffs' Exhibit 10.) (Inasmuch as both sides place emphasis upon this card, and it is very difficult to describe realistically its appearance, a photostat of it is attached to this opinion [see p. 244].) The plaintiffs informed Brandell that they did not wish to sell. In September, 1944, plaintiffs decided to sell. Plaintiff Joseph Vigli phoned the Davis Realty Company and told the girl who answered that plaintiffs wanted to list their property with the company to sell it for them, and that they had already talked to Mr. Brandell and would like Brandell to come out and talk it over. The following Sunday Brandell came out and gave them another card (a duplicate of plaintiffs' Exhibit 10). Brandell told plaintiffs that the Davis Company had quite a staff, all of whom would work on the matter of selling the property. Brandell suggested that the building was depreciated and that $50,000 would be the best price obtainable. Plaintiffs would not agree to that sum. The next night, Brandell returned, and plaintiffs signed the listing agreement headed ''Agreement to Sell'' with a sale price

of $55,000. (Again, because of its importance and the difficulty of properly describing its appearance, it is reproduced and attached to this opinion and will be referred to as the "listing agreement." [See p. 244.]) Neither plaintiff noticed the words which were stamped at the head of the agreement "Where Davis Realty Co. appears herein change to Jay Brandell," nor the blacking out at the end of the agreement of the words "Davis Realty Co." Plaintiffs at all times believed that they were doing business with Davis Company and that Brandell was an agent or employee of Davis Company.

The Sunday following the execution of the listing agreement, plaintiffs saw an ad in the San Francisco Chronicle advertising the property for sale for $58,500. The ad ended "Jay Brandell D-A-V-I-S Realty 500 Geary (at 14th) BA 9700." Immediately plaintiffs contacted Brandell asking why the sale price was advertised as $58,500 when Brandell had theretofore told them that $50,000 was all could be obtained and they had signed up to sell at $55,000. Brandell's answer was that they could advertise it at any price they wanted and would try to get the best price possible. Brandell brought plaintiffs an offer of $50,000 which they refused, telling him that if anything were to be cut it would have to be the commission. Brandell then told them that the commission had to be split three ways, one-third to Davis, one-third to defendant Abrams, and one-third to Brandell. Brandell then brought plaintiffs a contract to sell the property for a flat $50,000, which the plaintiffs also refused.

On September 21st, Brandell brought to plaintiffs a "Uniform Agreement of Sale and Deposit Receipt," in which defendant Abrams acknowledged receipt from one Galant of $1,000, on account of a purchase price of $51,500 for the property, which Galant agreed to pay, subject to the approval of the seller. The document is quite lengthy and contains the usual provisions of such an agreement. It had already been signed by Galant as purchaser. Opposite his signature appears a blank line and below it the printed words "Agent for Seller By" and thence follows the signature of the defendant Abrams. Up to this time the plaintiffs had no knowledge of Abrams and never did meet him. Following the portion of the document signed as above, appears the following: "Approval. San Francisco, California 9/21, 1944. The seller hereby approves the sale of the property described herein,

**AGREEMENT TO SELL**

San Francisco, California

336903

September 6, 1946

In consideration of the listing for sale and services rendered by Davis Realty Co., I hereby employ them as my sole and exclusive agents with the exclusive right to sell, or dispose of, the property situated in the City and County of San Francisco, State of California, described as follows:

That certain lot and improvements known and designated as 350 Laguna Honda Blvd., including stoves, linoleums, wall beds, hall carpets and all other furniture or furnishings in the building rented in name of present owner and used in the operation of same.

Under the following terms and conditions:

Price ...... Cash ...... All Cash ...... Balance ..... Terms .....

This employment and authority shall continue in force for ninety days from date hereof. In the event of the sale of the above property by Davis Realty Co., or by any one else, including myself, while this authorization is in force, I agree to pay them the necessary commission of 5% of the first $10,000 and 2½% of the balance of the above price.

$10,000

*(remaining body text illegible)*

JAY BRANDELL

336903

upon the terms and conditions hereinabove set forth and agrees to pay on demand to Jay Brandell the sum of Two Thousand dollars ($2000.00) Dollars for services rendered,'' and then a provision as to the disposition of the deposit in case of a forfeit. As Brandell agreed to reduce the commission provided in the listing agreement to $2,000, plaintiffs signed immediately below the clause above set forth. Brandell told plaintiffs that Galant had put up at Davis Company the $2,500 increased deposit which the agreement required upon approval by the seller. No part of this money was received by plaintiffs. Brandell later notified plaintiffs that the deed was ready and on October 18th, they went to the title company office to sign it. Plaintiffs then asked Brandell ''if anybody else was in this deal, and he said absolutely not.'' Plaintiffs signed the deed and escrow instructions. The title company clerk wrote on the instructions in the presence of Brandell and plaintiffs the amounts to be paid, ''allow taxes, $231.15, allow rent, per statement of Davis Realty Company, and pay Davis on account of commission $2000.'' A statement dated October 20th and headed ''Davis Realty Co.'' with its address and telephone number was received shortly thereafter by plaintiffs through the mail. It stated: ''Sale price $51,500,'' then listed taxes, breakdown of rents, federal revenue stamps, notary fees, recording fees, ''Commission $2000.'' While these transactions between plaintiffs and Brandell were being had, a most interesting situation was developing, in which the defendants Abrams, Letsinger and Davis appear. Abrams and Letsinger bore to Davis, as will hereinafter appear, the same relationship that Brandell did.

It was on September 5th that plaintiffs signed the listing agreement. Between that time and September 9th, Abrams went to Galant, who had formerly done business with him and who visited the Davis Company on an average of once a month and had some of his letters typed there, and told him about plaintiffs' property. Abrams signed, as seller's agent, a receipt to Galant for a deposit of $1,000, on a purchase price for the property of $50,000. The check for this, although Abrams, like Brandell, claims he was acting individually and not for the Davis Company, was made payable to the Davis Company. It is this offer which Brandell had in mind when he told Vigli he had a $50,000 offer for the property. As Vigli refused it, the check was returned to Galant on September 14th. On September 16th, Galant raised his offer to Abrams

to $51,500, gave Abrams a $1,000 check payable to the Davis Company, and signed the "Uniform Agreement of Sale and Deposit Receipt" which Viglis accepted on September 21st. The next day, Galant gave Abrams the additional deposit check of $1,500 likewise made out to the Davis Company (and later with the other check cashed by the Davis Co.). It was on September 16th or "even . . . earlier" that Davis claims he first heard of the Vigli matter. A day or two after September 21st Galant claims that he decided that he wanted to sell the property so he authorized Abrams (who up to this point at least had not been Galant's agent) to obtain a buyer for the property. Immediately, between September 21st and 25th, one Stotts was shown the property by defendant Letsinger and on the 25th, Stotts signed the usual uniform agreement of sale agreeing to pay $58,000 for the property, $20,000 of which was to be a second lien on the property in question and a first lien on some country property owned by Stotts. The receipt portion of the document, receipting for a deposit of $2,500, is signed "Davis Realty Company, agent for seller, by D. C. Letsinger." Although Abrams was supposed to be the agent for Galant, the seller, this writing shows Davis Company, by Letsinger, as the agent for the seller. Abrams took this to Galant, but Galant refused to accept the offer because of the second lien feature, but said in effect that he would accept any offer that would net him a profit of $1,500. Davis knew of these transactions as they occurred, so according to his own testimony, on September 26th or 27th "the deal was put up" to him by Abrams and Letsinger as a result of which Davis was to buy the property from Galant for $53,000 (giving Galant his $1,500 profit) and resell it to Stotts for $58,000. Shortly after that Abrams brought Galant a writing to the effect that Davis was buying the property and Galant was to receive $1,500 profit plus his $2,500 deposit, a total of $4,000. Thereupon Galant wrote the title company, enclosing deed from himself and wife to Stotts and wife, to be delivered upon receipt for him of $4,000, and stating: "Any further instructions necessary to close the transaction you will please accept from the Davis Realty Company, as we are selling the property to them as principals, and they, in turn, are reselling the property to Garver B. Stotts and wife." Although this was a sale to Davis and a resale by him to Stotts, it will be noticed that the deed ran directly from Galant to Stotts.

On October 2nd, Galant wrote a letter to Davis Company—"Attention: Mr. Wm. J. Davis," stating that the Stotts offer

of September 25th was not satisfactory because of the second lien feature, ''but I will sell the before described property to you as a principal'' for $1,500 profit plus the return of the $2,500 deposit. In case Davis met those terms ''you have my permission and approval to proceed with the sale of the property to said Garver B. Stotts and wife, dealing with them as the principal, and make such profit in connection with said sale as you are able to make and retain said profit for your own account.'' The same day Letsinger wrote Stotts to the effect that ''we'' had approved his offer of September 25th, the purchase price to be $58,000. $37,000 was to be secured by a first deed of trust to Western Service Corporation in the sum of $37,000, and $20,000 secured by a second deed of trust to William J. Davis, or his nominee, plus a first lien on some Tulare County property. On October 18th, the Viglis were taken by Brandell to the title company to sign the deed to Galant. The deed from Galant to Stotts was signed the same day.

Of the $2,000 commission paid by Viglis, Brandell received one-third, Abrams one-third, and Davis one-third. Galant made $1,500 on the deal; Letsinger received no commission from Stotts but did receive $1,500 ''and some odd'' from Davis. He claimed that this was a commission paid him by Davis for selling the property from Davis to Stotts and not for representing Davis in buying from Galant. Davis received in addition to the $666 (one-third of the $2,000) a profit of approximately $4,000.

The Viglis at no time met or talked with Davis, Abrams or Letsinger, all their transactions being with Brandell.

There is very little, if any, conflict in the testimony concerning the facts so far set forth, except that Brandell denied ever stating or intimating that he was an agent or employee of Davis Company or that he was acting for anyone other than himself and the Viglis. The main conflict comes in connection with the relationship between the parties to this action, and even there, there is very little difference in the evidence on that subject, the real difference being in the inferences which might be drawn, and which the court drew, from that evidence. Defendants contend that the only inference possible is the one supporting their position, but they are wrong in this contention.

The defendants Brandell, Abrams and Letsinger all are licensed real estate brokers, as is defendant Davis; all three of

them have desk space in the Davis Realty Company office, 5000 Geary Boulevard (at 14th Avenue), where there are about 20 real estate brokers having desk space. All three of them use a card identical with Exhibit 10 except, of course, that their names appear instead of Brandell's. Davis himself uses an identical card with the exception that the words "Office at" do not appear. All three use defendants' Exhibit BB form of "Agreement to Sell" inserting their respective names at the top where appears the name "Jay Brandell." All three have written contracts with Davis such as the one signed by Brandell reading: "For and in consideration of Desk Space at 5000 Geary Boulevard, San Francisco, California, and for telephone, stenographic and bookkeeping services, in connection with the conduct of my real estate brokerage business, I, the undersigned tenant broker, agree to pay WM. J. DAVIS, DBA DAVIS REALTY Co., fifty percent of my profits made from my real estate or insurance activities. It being understood that I am not to pay Wm. J. Davis anything on account of renewals of my existing insurance business or pay anything from the profits of any other venture or other line of business in which I am engaged or may become engaged during my tenancy or thereafter. It is understood that my tenancy is on a month to month basis. It being distinctly understood and agreed in connection with my tenancy that I am not an employee of WM. J. DAVIS and that said WM. J. DAVIS does not control or does not have the right to control my time or acts and I can come and go as I see fit." They all receive the services outlined in the agreement and use the phone listed under the Davis Company name. Davis supplies them with cards, stationery, forms, etc., without charge.

Defendants claim that the desk space contract, the type of card used by the defendants (Exhibit 10), the listing agreement which they contend shows was only made with Brandell and not with Davis Company, and the uniform agreement of sale and deposit receipt signed by Viglis in which they agree to pay the commission to Jay Brandell (and no mention of Davis Co.), conclusively establish without conflict the fact that no fiduciary relationship existed between plaintiffs and any defendant other than Brandell.

But defendants have overlooked the inferences that reasonably may be drawn from those documents coupled with the other facts in the case. Practically the same contention was made in *Cauhape* v. *Security Savings Bank*, 118 Cal. 82 [50

P. 310], wherein the court said at page 84: "It is assumed as a premise by appellant, upon which he bases his argument for a reversal, that 'there is no serious question of fact in the case; and the order granting a new trial was the result apparently of a change of the view first taken by the trial court of the law bearing upon the facts.' The record fails to sustain this assumption. While the evidence tending to prove the circumstances relied on by plaintiff to sustain his right to recover was uncontradicted, the ultimate facts to be deduced therefrom depended largely and essentially upon inferences not in themselves obvious or certain. When the facts necessary to sustain the judgment do not naturally follow as a necessary sequence from the probative facts, but must depend upon inferences to be deduced therefrom, it is as exclusively the province of the trial court to make those deductions and find the facts, as where the evidence itself is conflicting. In fact, the evidence may, in such an instance, be said in one sense to be conflicting, since the facts which it tends to prove are uncertain until found.

"In such a case, the trial court having in its discretion set aside its findings, for this court to reverse its order would be in effect coercing it to a particular conclusion upon a controverted question of fact, and this it is not within our power to do."

The lower court drew the inference that Brandell was either the actual or ostensible agent of Davis. The question is not whether such an inference is the only one, or the one most likely, to be drawn, but is it one that reasonably can be drawn? It is not unreasonable to infer that there was an actual agency from the following facts, among others in the case: Brandell's close association with Davis; the fact that almost immediately after Brandell signed up the Viglis, Abrams and Letsinger, bearing the same relationship to Davis as did Brandell, started working on "the deal"; the advertisement in the Chronicle ending "Jay Brandell, D-A-V-I-S Realty Co."; the fact that the receipts of deposit on the Galant offers to purchase from Vigli were signed by Abrams as "Agent for Seller" (how could that be if Brandell alone was the agent for the Viglis, the sellers?); the fact that the deposit checks were made to and cashed by Davis Company; the instructions to the title company to withhold a $2,000 commission for, and pay to, Davis Company; the fact that although Galant testified that he employed Abrams as his agent, "Davis Co. by Letsinger"

suddenly appeared as his agent; the fact that the commission check was payable to, endorsed and cashed by Davis Company; the fact that of the commission on the Vigli-Galant sale, Davis and Abrams each received one-third (The desk space contract, which is so strongly stressed by defendants provides for the payment to Davis of 50 per cent of "my profits made from my real estate" activities. One of the inferences that can be drawn from this circumstance is that the desk space contract was a device to be used when necessary to make it appear as if there were no agency relationship between Davis and the other defendants); the fact that when Vigli phoned the Davis Company and told the girl that he wanted to list his property with the Davis Company and would like to discuss the matter with Mr. Brandell, no information was given him to the effect that Mr. Brandell was not authorized to act for Davis Company; the statement from the Davis Company to Viglis showing the details of the application of the purchase price.

On the question of ostensible agency—the holding out by Davis of Brandell, Abrams and Letsinger as his agents—the foregoing facts and the inferences to be drawn are also strong. That plaintiffs relied and acted upon such a holding out is shown, among other things, by their instructions to the title company when they deposited in escrow their deed to Galant, "allow account of rent (per statement of Davis Realty Company). Pay Davis account commission $2,000."

Defendants contend that the Viglis should have known on receiving the Brandell card that he was simply a broker with his office at Davis Realty Company. Had a studied effort been made to design a card calculated to deceive the average person as to Brandell's true relationship to Davis Company, no card better for the purpose could be evolved than the one used here. The things that strikes the eye most forcibly in looking at it is the blue and yellow Davis Company emblem that takes up about one-fifth of the card, but visually appears to take up more. The words "Office at" are in small, light type. A person looking at the card, even if he noticed "Office at," would reasonably get the impression that Brandell was connected with Davis Realty Company in a relationship other than just a tenant. The same is true of the listing agreement. The Davis Company emblem sticks out like a sore thumb. The sentence "Wherever Davis Realty Co. appears herein change to Jay Brandell" stamped at the head of the instrument, and

not too clearly, as the words "wherever" and "change" did not make a full impression on the paper, might not be noticed by the average person, but if noticed, its significance would not necessarily be understood. Particularly is this so in view of the emblem at the top; the fact that Davis Realty Company appears fourteen times; the fact that the sentence in question is not part of the agreement itself. Even the blacking out of "Davis Realty Co." at the end would not appear too significant, as the "by" remains in. After signing, it reads "By J. Brandell." The average person might very well conclude that the substitution of Brandell was an arrangement or policy of Davis Company to place the particular listing solely in the care of that individual employee.

It is true that the evidence is susceptible of the interpretation claimed for it by defendants, namely, that Brandell was acting for himself alone; that although the property was advertised for seven or eight days. Galant was the only purchaser who appeared; that Abrams and Letsinger were also acting as independent brokers for themselves respectively; that no agency or employee relationship existed between Davis and any of the other defendants; that after Stotts offered to buy, offering a second mortgage which Galant was unwilling to take, at Galant's suggestion Davis was interested in the transaction; that the arrangement between Davis and the other defendants was as set forth in the desk space contracts; that Brandell, Abrams and Letsinger were neither the actual nor ostensible agents for Davis. But this is only one of the interpretations to be made of the evidence. The interpretation that the court made is actually more reasonable and proper under all of the facts of the case.

It is not claimed that the so-called "tenancy agreement" between Davis and Brandell was ever called to the attention of plaintiffs, and therefore the plaintiffs are in nowise bound by its terms, nor, so far as they are concerned, does it offset the effect of the acts of Davis justifying the inference of agency. If, actually, Brandell had no agency affiliation with Davis Company it would have been a simple matter to make that clear and certain, on the cards and forms. The conclusion is almost inescapable that should the arrangement contended for by defendants be sustained by the court, it would supply a neat subterfuge for allowing Davis to reap a harvest from irregular dealings with properties listed with any of the "tenant brokers" without the shackles of the fiduciary

doctrine of agency law. Davis was perfectly free to make use of all the connections made by his "tenant brokers" both selling and buying. The fact that all of the three defendant "tenant brokers" were bound to pay him one-half of all their commissions to enjoy the privileges of his office, is a rather suspicious circumstance.

The evidence justifies the conclusion that defendant Brandell was acting as the agent of Davis; that both knew that the property would bring a sum substantially more than the $50,000 Brandell tried to get plaintiffs to accept; that at the time Brandell obtained plaintiffs' acceptance of the $51,500 Galant offer, either one of two situations was the fact—either Galant was obtained merely for the purpose of holding the property until a higher price could be obtained, or Galant was a bona fide purchaser, but defendants knew that they could get a higher price and violated their confidential relationship with plaintiffs in not disclosing that fact. Naturally plaintiffs would not have sold for $51,500 had they known that the property would bring within a few days $58,000 (a sum within $500 of the amount the defendants set forth in their Chronicle ad). Having in mind that Davis purchased the property from Galant the following language from *Rattray* v. *Scudder*, 28 Cal.2d 214, 224 [169 P.2d 371, 164 A.L.R. 1356], is appropriate: ". . . the broker, when pursuing his own interests, cannot ignore those of his principal and will not 'be permitted to enjoy the fruits of an advantage taken of a fiduciary relation, whose dominant characteristic is the confidence reposed by one in another.' (*Curry* v. *King, supra,* 6 Cal.App. 568, 575 [92 P. 662].) It has therefore been stated that, 'The law does not allow the agent who has also a right to purchase to wait until someone makes an offer of an amount in excess of the agreed purchase price and then elect to purchase the property at the lesser price without informing the owner of the higher offer, and after the agent has obtained the consent from the owner to buy the property, then immediately sell it for the higher price as his own property.' (*Neighbor* v. *Pacific Realty Association, supra,* 40 Utah 610 [124 P. 523; 34 Ann.Cas. 1914D 1200].) . . . One who acts as an agent and also deals with his principal as to the subject matter of the agency cannot take advantage of his principal by withholding from him information secured by means of the agency. In the language of the Restatement of Agency: 'Before dealing with the principal on his own account . . . an agent has

a duty, not only to make no misstatements of fact, but also to disclose to the principal all material facts fully and completely. A fact is material . . . if it is one which the agent should realize would be likely to affect the judgment of the principal in giving his consent to the agent to enter into the particular transaction on the specified terms. Hence, the disclosure must include not only the fact that the agent is acting on his own account . . ., but also all other facts which he should realize have or are likely to have a bearing upon the desirability of the transaction from the viewpoint of the principal.' (§ 390, Comment a.)'' (See, also, *Bell* v. *Scudder,* 78 Cal.App.2d 448 [177 P.2d 796].)

Stress is laid by defendants upon the fact that the plaintiffs both testified that they did not notice the ''Office at'' on the card of Brandell's, and the alterations in the listing agreement, and quote *Zibbell* v. *Southern Pacific Co.,* 160 Cal. 237, 241 [116 P. 513], to the effect that the physical facts must overcome a witness' testimony that he did not see or hear. That was an accident case and is not in point for the reason that here, the peculiar physical makeup of the documents in question, coupled with the other facts of the case, or even standing alone, would justify an ordinarily reasonable person in inferring that Davis Company was Brandell's principal, and that in signing the listing agreement the signer was entering into an agreement with the Davis Company. This is not the only inference to be drawn, of course, but it is a natural one. For the same reason, the rule set forth in 6 California Jurisprudence, section 50, page 84, to the effect that if a person signs a writing without reading it, he nevertheless is bound by its terms, does not apply. It is not a question of plaintiffs not reading the writing, but not noticing under the circumstances matters which other persons reasonably might not have noticed.

The inferences which reasonably can be drawn from an examination of the writings and the directly contradictory testimony of Brandell as against that of the plaintiffs causes the conflict of evidence rule to apply to this appeal. Cases like *de la Falaise* v. *Gaumont-British P. Corp.,* 39 Cal.App.2d 461 [103 P.2d 447]; *Moss* v. *Stubbs,* 111 Cal.App. 359 [295 P. 572, 296 P. 86], and others cited by defendants and holding that where there is no substantial conflict in the evidence, the rule does not apply, are not applicable here as the conflict is real and substantial.

Section 2300 of the Civil Code defines ostensible agency as one "when the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him." Having in mind the rule cited by defendants from *Walsh* v. *American Trust Co.*, 7 Cal.App.2d 654 [47 P.2d 323], that there is no presumption that an agency exists but on the contrary that a person is acting for himself solely, and applying the test set forth in the code to the facts of this case—the type of cards and instrument forms provided by Davis Company, the instructions to the title company, and the statements to plaintiffs on Davis Company letterheads, the general situation and facts of this case certainly show that Davis, either intentionally, or by want of ordinary care, held Brandell out to be his agent, or at the very least, justified such an inference to be drawn. (*Pacific Ready-Cut Homes, Inc.* v. *Seeber,* 205 Cal. 690 [272 P. 579]; *Stanhope* v. *Los Angeles Coll. of Chiropractic,* 54 Cal.App.2d 141 [128 P.2d 705].)

In determining this question, as also the question of an inference of actual agency, it is not necessary to resort to the statements of Brandell. Eliminating the testimony as to his representations to plaintiffs entirely (as we have to do under the rule set forth in *Christian* v. *Rice Growers Assn.,* 50 Cal. App.2d 617 [123 P.2d 534]), there is still plenty of evidence in the case to support the lower court's conclusions. Defendants point out that the test of ostensible agency is set forth in *Hill* v. *Citizens Nat. Trust & Sav. Bk.,* 9 Cal.2d 172, 176 [69 P.2d 853], as, first, that the person dealing with the agent must do so with belief in the agent's authority and this belief must be a reasonable one; second, such belief must be generated by some act or neglect of the principal sought to be charged; and third, the third person in relying on the agent's apparent authority must not be guilty of negligence. The evidence in this case meets all these requirements.

The facts in the case of *Traders C. Corp., Ltd.* v. *Radin & Kamp, Inc.,* 131 Cal.App. 479 [21 P.2d 461], are readily distinguishable from those in our case. There Clifford, who rented space in the department store of Radin & Kamp in Fresno, signed orders for goods in his own name, although the seller's agent marked the orders "Charge to Radin & Kamp." Clifford wrote one letter on Radin & Kamp stationery and three telegrams which he signed "Radin & Kamp." The merchandise was shipped to Radin & Kamp and delivered

to Clifford through their receiving room. "No one connected with respondent [Radin & Kamp] had any knowledge of these deliveries except the receiving clerk and Clifford. Invoices and statements of account were mailed to Radin & Kamp at Fresno. They were apparently taken from the mail by Clifford. . . . No responsible officer, agent or employee of respondent knew of the letter or telegrams and no direct or implied authority to Clifford to sign 'Radin & Kamp' to the telegrams was shown." The court very properly found that the evidence fell far short of establishing an ostensible agency. In our case, however, Davis Company not only knew of the type of cards and forms Brandell was using, but actually issued them to him. Letters and statements on Davis Company letterheads not only were sent out, but were sent out by Davis Company and the commission was taken by Davis Company and thereafter split up by it.

Defendants place great reliance upon the fact that neither plaintiff had met Abrams or Davis at all, and had not seen Letsinger for about four years, nor had either one talked to any of these three men in any way in connection with the transaction involved here. Defendants argue that from that fact, plus the fact that the deposit receipt "agrees to pay on demand to Jay Brandell the sum of Two Thousand dollars ($2000.00) for services rendered," plus the alteration in the listing agreement which we have already discussed, that the Viglis must have known that they were dealing with Jay Brandell solely. Any one of these facts standing alone might support defendants' position, but when taken in connection with the other facts of the case, place a different aspect upon the situation. Being justified in believing that Brandell was the agent of Davis from the other circumstances of the case, the fact that the commission agreement referred to Brandell and not to Davis Company would not be sufficient to cause plaintiffs to suspect that Davis Company was not the principal, and, of course, there can be a holding out of agency by a person without such person actually talking to the person who acts upon such holding out. That was the case here.

Defendants cite *Allen* v. *San Francisco W. D. Produce Exch.*, 59 Cal.App. 93, 96 [210 P. 41], as support of their contention that because plaintiffs did not actually see the Davis Company office or see or talk to Davis, Letsinger, and Abrams, there can be no ostensible authority. In that case a clerk whose only duty was to open the office mail and bring it to

the attention of the proper officers, wrote an order on an office letterhead and stamped the name of one of the officers to it. The court held there was no evidence that the plaintiff knew these facts or was misled by them. In our case, the evidence shows that the plaintiffs knew the facts of the holding out of the agency heretofore discussed and were misled into believing they were dealing with Davis Company.

Defendants claim that the evidence does not show that Brandell participated further in the transaction after he had signed up the plaintiffs. But he did participate later to the extent that he permitted the $2,000 commission paid by the Viglis out of the Galant purchase price, which under defendants' theory of the case belonged to Brandell alone, to be used by Davis Company as a credit in the Stotts transaction, and finally permitted Davis Company to split it, one third to Davis Company, one-third to Abrams, and only one-third to Brandell. But even if he did not participate in any further profits from the transaction, the legal situation is not changed. His part of the deal had been performed. Acting for Davis Company he had tied up the plaintiffs until such time as Davis with the assistance of his other agents, Letsinger and Abrams, could work out the matter of getting a higher price for the property.

Defendants' second point on appeal is that when plaintiffs accepted Galant's offer to purchase by signing the agreement of sale and deposit receipt (plaintiffs' Exhibit 13) the title passed by equitable conversion from plaintiffs to Galant; therefore plaintiffs legally could not have sold the property again, either to Stotts or anyone else; and hence cannot complain about what was done with the property thereafter. This, of course, is assuming that Galant was a bona fide purchaser and not buying for the defendants, to tie up the property until a purchaser at a higher price could be obtained, an inference which could reasonably be drawn from the evidence. But assuming that Galant was a bona fide purchaser, is the doctrine of equitable estoppel a defense against the claim that the defendants Brandell and Davis, as plaintiffs' agents, received secret profits? Undoubtedly the true rule of equitable estoppel is, as set forth in *Estate of Dwyer*, 159 Cal. 664 [115 P. 235], cited by defendants, to the effect that when a binding agreement of sale is entered into by the parties, an equitable conversion is worked; the purchaser becomes the equitable owner of the land and the seller the owner of the purchase

price. But that doctrine has no application here. This is not an action between plaintiffs and Galant, or over the title to the property. This is an action against real estate agents who violated their fiduciary relationship to get more money for themselves. Equitable conversion is an equitable doctrine and equity can never be invoked to sustain a fraud or do a wrong. (10 Cal.Jur. 519.)

In *State* v. *O'Connell,* 121 Wash 542 [209 P. 865], the court refused to apply the doctrine as against an alien land law violator, saying that (page 868 [209 P.]) equitable conversion "is a fiction which will be enforced only when necessary to accomplish manifest justice, and never to circumvent the public policy. . . ."

In *In re Walkerly,* 108 Cal. 627 [41 P. 772, 49 Am.St.Rep. 97], to try to get away from the rule against perpetuities, an attempt to invoke the doctrine of equitable conversion was made. The court said (page 652): "This would not only be a surprising application of the doctrine, but would be a novel and startling method of evading the law against perpetuities by invoking an equitable fiction. The rule of equitable conversion merely amounts to this, that where there is a mandate to sell at a future time, equity, upon the principle of regarding that done which ought to be done, will for certain purposes and in aid of justice consider the conversion as effected at the time when the sale ought to take place, whether the land be then really sold or not."

". . . the doctrine of equitable conversion . . . [is] resorted to only where it is necessary to determine ownership." (*In re Van Zandt's Estate,* 142 Misc. 663 [255 N.Y.S. 359, 364].) "The law does not favor conversions . . ." (*In re Loew's Estate,* 291 Pa. 22 [139 A. 582, 583].)

The last point raised by defendants is that plaintiffs, between the signing of the agreement to sell and the signing of their deed to Galant, had knowledge of the transactions now complained about. They contend this knowledge was (a) constructive, and (b) actual.

The claim of constructive knowledge is based upon the fact that all parties, Vigli, Galant, Davis and Stotts, placed their instructions and documents in escrow with the same title company and as part of the same escrow. Defendants contend that the title company was therefore the agent for Viglis, and that the title company's knowledge of the various deals as shown in the escrow instructions is imputed to Viglis; in other

words, that the knowledge of the agent is the knowledge of the principal. Defendants rely on *Early* v. *Owens,* 109 Cal.App. 489 [293 P. 136], where the court held (page 494): "It is well-settled law in California that the holder of an escrow is agent for all parties up to the time that the escrow is closed. . . . It is also well-settled law in this state that notice given to or possessed by an agent within the scope of his employment and in connection with and during his agency, is notice to the principal."

While that is the general rule, there are exceptions to it. In *Thompson* v. *Stoakes,* 46 Cal.App.2d 285 [115 P.2d 830], an action similar to the one here was brought against the plaintiffs' agents to recover secret profits in a real estate transaction. This court (at page 292) "pointed out that in *Early* v. *Owens, supra,* the appellate court expressly held that the finding that the principal had *actual* knowledge was supported by the evidence." (Emphasis added.) It stated that the general rule would not be applied where there were two escrows, "to documents deposited in the escrow to which the party sought to be charged with notice was not a participant." It further held: "As a matter of substantive law, where a positive fraud has been perpetrated by one agent, appellants herein, such fraud does not become non-actionable because of the knowledge of another agent, the escrow holder, of facts not communicated to the common principal. As between two innocent parties, notice to the agent of one is notice to the principal, but, as between the principal and the fraudulent agent, notice of another agent should not be imputed to the principal." While our case is probably not one of two escrows (the title company agent testified that it was all under one escrow number but also designated it as "a double transaction") the principle that notice to another agent should not be imputed to the principal in protection of the fraud of another agent of the principal, would apply.

*Kroeker* v. *Hurlbert,* 38 Cal.App.2d 261 [101 P.2d 101], expressly overrules *Early* v. *Owens, supra,* insofar as it might apply to the situation in this case. After referring to the general rule as set forth in the Early case, the court says (page 269): "A further consideration is that a real estate broker should not be relieved from the consequences of a plain fraud and violation of his duty to his employer, such as was found by the court here, on a technical constructive notice unless this is necessary in order to conserve established rules which, in

some cases, are most salutary. The rule here in question, as laid down in cited cases and others, has been invoked in order to do equity and to prevent fraud, and it is not necessary that this rule be so extended, under the circumstances of this case, as to permit it to be used in perpetuating a fraud and in protecting an agent in the violation of his duty to his employer.'' The court also points out that the escrow holder's agency is a limited one, where ''Although the papers were included in the same escrow, in a very real sense the transfer of this deed to the appellants was a separate matter from the other part of the escrow which involved a conveyance of the land from the former owner to the respondents. . . . Assuming that the escrow holder was the agent of the respondents in the passing of the deed conveying a one-fourth interest in the oil rights to the appellants the authority and scope of its agency for that purpose was limited, the entire matter of the consideration for that deed being excluded from the escrow agent's duty and from the sphere of its agency in that regard. That consideration was the services of the appellant E. C. Hurlbert in buying the land as cheaply as possible. Not only did the escrow holder have no knowledge of that consideration or the obligation of the appellants to perform that service, but if it had had such knowledge the same would not have been within the scope of its agency. If the escrow agent had knowledge of facts which would otherwise affect this consideration, that knowledge related to a matter which was not within the scope of its agency. It follows that the respondents would not be bound by any such knowledge, and the evidence amply supports the court's finding that nothing concerning that matter was communicated to the respondents and that they had no actual knowledge of any such fact.''

So here, the knowledge of the escrow holder concerning the matters other than the deed and instructions in the Vigli-Galant matter was without the scope of the title company's agency for plaintiffs. It was plaintiffs' agent merely to deliver their deed and obtain for them the consideration set forth in their instructions, paying out of that consideration the specific amounts plaintiffs instructed them to pay out. The agency was limited and the agent's knowledge, imputable to his principal, likewise limited to matters within that agency. It is significant that in this respect the title company escrow clerk who handled the transaction testified: ''Q. All right.

In other words, the seller in a case like this puts in his deed, and calls for his money, and that is all, so far as your records are concerned, that he sees in this deal? A. Yes, each party would see his own end of it.'' In any event, the constructive notice rule must not be permitted to enable a real estate agent to commit a fraud on his principal.

The claim that plaintiffs had actual knowledge of the subsequent transactions is based primarily upon the testimony of Mrs. Houston, who was plaintiffs' manager of the apartments. In September, Letsinger had brought Stotts out to go through the building. On October 3rd, Stotts came to the building and rented from her a vacant apartment. The next day she told plaintiff Joseph Vigli that Mr. Letsinger had told her that Stotts had just contracted to buy the building. Stotts paid the rental and occupied the apartment just across the hall from Viglis. Letsinger told her not to tell plaintiffs that Stotts was buying, but she did. Brandell testified that he told Viglis that Stotts was buying from Galant. The Viglis denied this, hence creating a conflict. However, it must be remembered that thereafter, when plaintiffs, their lawyer, and Brandell were at the title company, plaintiffs' lawyer asked Brandell if there were anyone other than Galant interested in the deal and Brandell told them ''absolutely not.'' While Brandell denies making this statement, for the purposes of this appeal we must consider that he did. Then, any intimation which the Viglis may have had that Stotts was also buying would be offset by the positive statement of their own agent that no one else was interested in the deal. They had a right to rely on his statement as against the information given them by Mrs. Houston as to what Mr. Letsinger had said. The plaintiffs having relied upon their own agent's statement, that agent cannot now question its effect. Defendants complain that when the attorney asked Brandell if anyone else was interested in the transaction, he did not also ask the escrow clerk the same question. Nothing had occurred which would cause either plaintiffs or their attorney to question the reliability of their own agent, and hence, there was no occasion for asking the clerk.

The order granting a new trial is affirmed.

Peters, P. J., and Ward, J., concurred.