NORTH CAROLINA REAL ESTATE LICENSING BOARD v. CHARLES L. GALLMAN, MYERS PARK REALTY

No. 8010SC797

(Filed 19 May 1981)

1. Brokers and Factors § 4.1— real estate broker—dealings with principal

The general rule is that a broker can neither purchase from nor sell to his principal unless the principal expressly consents thereto, or with full knowledge of all the facts and circumstances acquiesces in such transactions.

2. Brokers and Factors § 4.1— real estate broker—option to purchase property

While an option to purchase real estate, given by the seller to a broker employed to sell the property, is generally valid, the broker cannot enforce the option without making a full disclosure to his principal of any information which he has relating to other prospective sales or the value of the property.

**3. Brokers and Factors § 8 — real estate broker's license revoked — sufficiency of findings of fact**

Findings of fact by the Real Estate Licensing Board were sufficient to support its conclusion that respondent made substantial and willful misrepresentations in violation of G.S. 93A-6(a)(1) and acted for more than one party in a transaction without the knowledge of all parties for whom he acted in violation of G.S. 93A-6(a)(4) where the Board found that seller listed a house for sale with respondent at an asking price of $15,000; the owner executed to respondent an option to purchase the property within 30 days for $11,000; respondent did not disclose to seller an offer subsequently made by a third person to buy for $15,000; respondent represented to the third person that the seller was the owner of the property and that the seller had accepted the third person's offer of $15,000; respondent made a secret profit of $4,000 by representing to the third person that he was acting as a broker for the seller when in fact he was acting for himself; respondent falsely represented to the third person that the seller had received an offer of $14,500 for the property; and even if respondent was not an agent for the third person, once respondent discussed the transaction with the third person, he had the duty of dealing with honesty and integrity.

APPEAL by defendant Gallman from *Preston, Judge.* Judgment entered 25 March 1980 in Superior Court, WAKE County. Heard in the Court of Appeals 6 March 1981.

Complaint was filed against respondent by another licensed real estate broker and supported by letter from George A. Rubis, the buyer from respondent of a house and lot near Lexington. After a hearing under G.S. 93A-6(a), the Licensing Board made, in pertinent part, the following findings of fact:

"(2) In early November, 1978, Mr. Robert L. Billings, III, contacted Respondent concerning the sale of a house owned by him at 117 Willowbrook Circle, Lexington, North Carolina.

(3) Mr. Billings listed the house for sale with Respondent at an asking price of $14,500. Mr. Billings, signed a listing contract with Respondent's firm, Myers Park Realty.

(4) Mr. Billings' wife, Mrs. Judy Billings, subsequently signed the listing contract and changed the asking price to $15,000.

(5) Respondent never gave Mr. or Mrs. Billings a copy of the listing contract.

(6) Respondent advertised the Billings house for sale in his company's regular newspaper advertising, and placed the house in the Lexington Multiple Listing Service.

(7) On or about November 11, 1978, Respondent contacted Mr. and Mrs. Billings and expressed interest in personally purchasing said house for $10,500. Mr. and Mrs. Billings told him that they could not sell for less than $11,000.

(8) On or about November 14, 1978, Respondent presented Mr. and Mrs. Billings with an 'option to purchase' contract, whereby Mr. and Mrs. Billings agreed to sell the property to Respondent for $11,000. The option was to be valid for 30 days. Mr. and Mrs. Billings signed the option contract.

(9) On or about November 25, 1978, Mr. and Mrs. George A. Rubis contacted Respondent as the listing agent, concerning the purchase of the house at 117 Willowbrook Circle.

(10) Respondent told Mr. and Mrs. Rubis that Mr. Billings owned the property, and that another offer had been submitted to purchase the property for $14,500.

(11) No other offer to purchase the property for $14,500, or for any amount, had been submitted by any person.

(12) Respondent did not disclose to Mr. and Mrs. Rubis that he had an option to purchase the property for $11,000.

(13) Mr. and Mrs. Rubis submitted a written offer to purchase the property for $15,000, and gave Respondent a check for an earnest money deposit of $500. Respondent deposited the check in the escrow account of Myers Park Realty.

(14) Respondent told Mr. and Mrs. Rubis that he would present their offer to Mr. Billings.

(15) Respondent never presented the offer to Mr. Billings and never presented any other offer to Mr. and Mrs. Billings while Mr. Billings held title to the property.

(16) On or about November 27, 1978, Respondent called Mrs. Rubis and told her that Mr. Billings had accepted the Rubis' offer to purchase the property for $15,000.

(17) This statement was false, since the Rubis offer had not been presented to Mr. Billings, and he had not accepted it.

(18) Mr. and Mrs. Rubis asked Respondent to send them a copy of their offer to purchase, as supposedly accepted by

Mr. Billings, but Respondent never did so.

(19) Respondent called Mr. and Mrs. Rubis several times, telling them that Mr. Billings desired to close the transaction quickly because he needed the money. Respondent again failed to disclose to Mr. and Mrs. Rubis that he had an option to purchase the property for $11,000.

(20) On or about December 5, 1978, Respondent presented a printed form deed to Mr. and Mrs. Billings. This document contained the property description and the names of the grantors (Mr. and Mrs. Billings), but the line for the name of the grantee was blank.

(21) Mr. and Mrs. Billings signed the deed, and Respondent paid them the balance of the purchase price.

(22) Respondent took the signed deed to Mrs. Judith Stewart, a notary public and former employee of Myers Park Realty, and asked her to notarize the signatures of Mr. and Mrs. Billings. Mrs. Stewart did so.

(23) Mrs. Stewart was not present when Mr. and Mrs. Billings signed the deed, and Mr. and Mrs. Billings never appeared before her to acknowledge their signatures.

(24) On December 5, 1978, Respondent caused said deed to be recorded in the Davidson County Registry. Respondent was the grantee on said deed.

(25) Respondent contacted Mr. and Mrs. Rubis, and arranged for them to close their purchase of the property by mail. Respondent did not disclose to Mr. and Mrs. Rubis that he had purchased the property for $11,000 and had taken title thereto.

(26) Mr. and Mrs. Rubis sent Respondent the balance of the purchase price by a check payable to Myers Park Realty. Respondent closed the transaction, and on December 15, 1978, Respondent caused to be recorded in the Davidson County Registry a deed from himself and wife, Margaret Gallman, to Mr. and Mrs. Rubis."

At the hearing respondent testified that when Billings first came to see him about the property, he told Billings the property

was worth on the market from $13,500 to $14,000 and that on 14 November 1978 he prepared and they signed the following "Option To Purchase":

> "For $1.00 (One) Dollar and other valuable considerations Bert & Judy Billings agree to the sale of the property known as 117 Willowbrook Drive to Charles Gallman his heirs and assignees for the sum of $11,000.00 dollars subject to, a loan assumption at Industrial and Savings in the amount of $ *around 9 M or $8,882.00.*

> This option good for thirty days plus any days while closing.

> Signed:

> s/BERT BILLINGS
> _____
> BERT BILLINGS, OWNER

> s/JUDY BILLINGS
> _____
> JUDY BILLINGS, OWNER"

Respondent further testified that when the Rubises came to see him he told them there was an option on the property, but he did not tell them that he had the option.

The Board concluded that respondent was guilty of: (1) "[m]aking any substantial and wilful misrepresentations" in violation of G.S. 93A-6(a)(1); (2) "[a]cting for more than one party in a transaction without the knowledge of all parties for whom he acts," in violation of G.S. 93A-6(a)(4); (3) "conduct . . . which constitutes improper, fraudulent or dishonest dealing," in violation of G.S. 93A-6(a)(10); (4) "[b]eing unworthy or incompetent to act as a real estate broker" in violation of G.S. 93A-6(a)(8) and (5) violating a regulation of the Board in failing to deliver a copy of the listing contract to the sellers in violation of G.S. 93A-6(a)(15). The Board thereupon ordered that respondent's broker's license be revoked.

Respondent petitioned for judicial review by the Superior Court under G.S. 150A-43. The trial court found that the findings of fact and conclusions of law were fully supported by the evidence and affirmed the revocation of the Board.

*Attorney General Edmisten by Assistant Attorney General Harry H. Harkins, Jr. for plaintiff appellee.*

*Morris and Hoke by Charles B. Morris, Jr. for defendant appellant, Charles L. Gallman.*

CLARK, Judge.

The respondent did not offer evidence in substantial conflict with that offered by the complainants. We, therefore, find that the findings of fact made by the North Carolina Real Estate Licensing Board were based on all the evidence and were fully supported. The questions before us are whether the conclusions of law are supported by the findings of fact. In determining these questions we direct our attention to the duties which the respondent owed to the seller, to the buyer, and to the public. In doing so we are not as concerned with the technical niceties of the law as we would be if rendering a decision in a case involving a claim by the seller or buyer against the broker. Rather, we consider these duties in light of the nature of this proceeding for sanctions against the respondent-broker for misconduct in violation of the licensing statutes.

In upholding the constitutionality of Chapter 93A, General Statutes of North Carolina, entitled "Real Estate Brokers and Salesmen" the court quoted with approval the language from decisions of other courts: " 'There is involved in the relation of real estate broker and client a measure of trust analogous to that of an attorney at law to his client, or agent to his principal.' . . . 'The real estate broker is brought by his calling into a relation of trust and confidence. Constant are the opportunities by concealment and collusion to extract illicit gains. . . . The broker should know his duty. To that end, he should have "a general and fair understanding of the obligations between principal and agent." ' " *State v. Warren,* 252 N.C. 690, 695-96, 114 S.E. 2d 660, 665 (1960).

It is the duty of the Licensing Board, in determining the qualification of those to be licensed as real estate salesmen or brokers, to have "due regard to the paramount interests of the public as to the honesty, truthfulness, integrity and competency of the applicant." G.S. 93A-4(b).

The right of the real estate broker to take an option from or make a contract to purchase with the listing seller and the duty of the broker to optionee-seller has not heretofore been decided by the courts of this State. In determining for the first time the

applicable standards of conduct for real estate brokers and salesmen under these circumstances we are guided by the foregoing statutory language which prescribes a standard of honesty, truthfulness, and integrity.

[1]    "The general rule is that a broker can neither purchase from, nor sell to, his principal unless the latter expressly assents thereto, or, with full knowledge of all the facts and circumstances, acquiesces in such course." The reason is that the broker-agent is bound to exercise the best skill and judgment and a high degree of fidelity and good faith to secure for his principal the best bargain possible, even though his own conflicting interests impel him to gain the most advantageous terms for himself. Annot., "Broker With Option To Purchase For Self," 164 A.L.R. 1378, 1378-79 (1946).

[2]    While an option to purchase real estate, given by the seller to a broker employed to sell the property, is generally valid, he cannot enforce the option without making a full disclosure to his principal of any information which he has relating to other prospective sales or the value of the property. The leading case on this subject is *Rattray v. Scudder*, 28 Cal. 2d 214, 169 P. 2d 371, 164 A.L.R. 1356 (1946), and its holding has been approved in other cases. *See Bell v. Scudder*, 78 Cal. App. 2d 448, 177 P. 2d 796, *cert. denied*, 332 U.S. 792, 92 L.Ed. 374, 68 S.Ct. 102 (1947); *Vigli v. Davis*, 79 Cal. App. 2d 237, 179 P. 2d 586 (1947); *Wells Fargo Bank v. Dowd*, 139 Cal. App. 2d 561, 294 P. 2d 159 (1956).

[3]    Respondent takes the position that when Billings executed to him the option to purchase the property within 30 days for $11,000, there was a severance of the listing agreement, a termination of the broker-agent and seller-principal relationship, and thus no duty on the part of respondent to disclose to Billings the offer subsequently made by Rubis to buy for $15,000. The listing agreement, a copy of which was not given to Billings, is not in the record on appeal, and the evidence does not disclose, and the court did not specifically find, whether there was a termination of the listing. We find respondent's position untenable in light of his representation to Rubis that Billings was the owner of the property and that Billings had accepted his offer of $15,000. Respondent was purporting to act for Billings but in fact was acting for himself without disclosing his role in the transaction to either Billings (seller) or Rubis (buyer).

The record on appeal reveals that respondent made a secret profit of $4,000. He did so by representing to Rubis that he was acting as broker for Billings, when in fact he was acting for himself. He falsely represented to Rubis that the owner (Billings) had received an offer of $14,500 for the property. Even if respondent was not an agent for the buyer (Rubis), once respondent discussed the transaction with Rubis, he had the duty of dealing with honesty and integrity. Instead, he took advantage of the confidence reposed in him as a broker. Under the circumstances it makes no difference whether respondent in dealing with Rubis was acting as broker or as optionee-owner. The licensing act should not be interpreted to require a licensee to be honest as a broker or salesman while allowing him to be dishonest as an owner.

We find that the findings of fact support the conclusion that respondent violated G.S. 93A-6(a)(1) and (4).

The judgement of the Superior Court upholding the license revocation is

Affirmed.

Judges ARNOLD and MARTIN (Harry C.) concur.