Thomas E. JOHN, Jr., and Sally D. John, Plaintiffs,

v.

A.C. ROBBINS; Dorothy S. Morris; Alfonzo W. Cox, Chloe B. Cox; Merrill Lynch Operating Partnership L.P. d/b/a Merrill Lynch Realty, Defendants.

No. C–89–560–D.

United States District Court, M.D. North Carolina, Durham Division.

April 24, 1991.

James B. Craven, III, Durham, N.C., Tom Bush, Charlotte, N.C., for plaintiffs.

Frank L. Bryant, Charlotte, N.C., for Robbins, Morris and Merrill Lynch Realty.

John C. Schafer, Durham, N.C., for Alfonzo W. Cox and Chloe B. Cox.

## MEMORANDUM OPINION

BULLOCK, District Judge.

Plaintiffs, purchasers of the residence at 132 Carolina Forest Road in Chapel Hill, North Carolina, bring this diversity action against Merrill Lynch Realty, two of its employees, and the prior owners of the residence. Plaintiffs allege Merrill Lynch

and its employees are liable for fraud, negligent misrepresentation, breach of fiduciary duty of agency, and unfair and deceptive trade practices in connection with the sale of the residence. Plaintiffs allege the prior owners of the residence are directly liable for fraud and negligent misrepresentation and vicariously liable for the fraud, negligent misrepresentation, and breach of the fiduciary duty of agency by Merrill Lynch Realty and its employees. All Defendants have moved for summary judgment. The court will deny summary judgment on all of Plaintiffs' claims against Merrill Lynch and its employees except to the extent that part of Plaintiffs' claim for unfair and deceptive trade practices is based on the alleged conflicting interests of Merrill Lynch and its employees in the sales transaction. The court will grant summary judgment on Plaintiffs' claims that the prior owners of the residence are directly liable for fraud and vicariously liable for the negligent misrepresentation and breach of the fiduciary duty of agency by Merrill Lynch and its employees; the court will deny summary judgment as to all remaining claims.

## I. BACKGROUND [1]

Plaintiff Tommy John, for many years a renowned major league baseball player, contemplated retiring from professional play to accept a coaching position with the University of North Carolina. John called Merrill Lynch Realty of Chapel Hill, North Carolina, in December of 1985, to retain an individual to assist him and his wife, co-plaintiff Sally John, in locating a home in the area. John communicated to Defendant Dorothy Morris, the real estate agent who answered his call at Merrill Lynch, that he wished to buy a house containing at least 5,000 square feet in order to accommodate adequately the Johns and their four children.

On February 12, 1986, Defendant Morris wrote the Johns requesting that they "resist the[ ] pleas" of other real estate agents seeking to represent the Johns in the Chapel Hill area. The Johns testified at their depositions that they worked exclusively with Defendant Morris in locating a home in Chapel Hill.[2] While Defendant Morris was showing the Johns around Chapel Hill on or about July 14, 1986, Sally John noticed an attractive contemporary home at 132 Carolina Forest Road. The owners of 132 Carolina Forest were Defendants Alfonzo and Chloe Cox. The Coxes had previously contacted Merrill Lynch Realty about selling the property through another Merrill Lynch agent, Lisa McAffee. Plaintiffs allege Defendant Morris knew the Coxes were in the process of listing 132 Carolina Forest with Merrill Lynch because Morris was to act as the co-listing agent for the property due to McAffee's inexperience.

After Sally John expressed interest in the home, Morris obtained permission from the Coxes for a one-time showing of 132 Carolina Forest to the Johns on July 15, 1986. Defendants Morris and Merrill Lynch admit that they would have received a three-per-cent commission from the Coxes had the Johns bought the home pursuant to this showing. The Cox Defendants also state they agreed to pay Morris and Merrill Lynch a three-per-cent commission if the Plaintiffs bought the house as a result of this showing. Plaintiffs allege that Morris never disclosed this commission arrangement to them. Sally John testified that Chloe Cox took Morris and the Johns on a "thorough tour" of the "whole house" in "twenty minutes to half an hour," during which Chloe Cox "pointed out all the details of the house," and described such features as the Vermont slate floor, the basement, pool and deck.[3] Sally John also testified that Chloe Cox stated on this occasion that the house contained "5,000 square feet of living space." [4]

---

1. The facts are taken from the complaint, answers, exhibits, and depositions of the parties. When the facts are disputed it is so noted.

2. Deposition of Thomas E. John, Jr., at 46 (Feb. 16, 1990); Deposition of Sally D. John at 153 (Feb. 14–15, 1990).

3. Deposition of Sally D. John at 27–28.

4. *Id.* at 29.

On July 31, 1986, Morris and Merrill Lynch entered into a formal six-month listing agreement for the house. Plaintiff Sally John testified Defendant Morris later called with the news that the house was for sale and stated, "We have the listing."[5] Plaintiffs acknowledge they ultimately became aware that Merrill Lynch and Lisa McAffee were the listing agents for 132 Carolina Forest. However, Sally John testified that at all material times the Johns did not know Morris was the co-listing agent for the house and did not know Morris would receive a commission for acting as the Coxes' agent if Plaintiffs bought the property.[6] The Johns informed Morris that their "price range" for a home was "about $500,000."[7] Sally John further testified that she confided in Morris as to the Johns' "bottom line," and that she understood the Johns' relationship with Morris to entail Morris' attempting "to get the best house in Chapel Hill for the [cheapest] price" for the Johns.[8]

On August 4, 1986, Defendant Morris wrote a letter to the Johns thanking them for their "loyalty" to her as their " 'real estate lady,' " and stating that 132 Carolina Forest was "on the market. We listed it last week."

As a result of Merrill Lynch listing 132 Carolina Forest, Morris and Defendant A.C. Robbins, the managing agent of Merrill Lynch in Chapel Hill, visited the home to obtain information, including square footage, necessary to prepare a comparative market analysis (CMA). Realtors prepare CMA's to determine an appropriate range of listing prices for a property. Morris admits she has never measured a contemporary home styled like 132 Carolina Forest and has never represented herself as able to do so. Defendants Morris and Robbins instead relied on Robbins' assessment of the architectural plans for 132 Carolina Forest to calculate the home's square footage.

Plaintiffs allege Morris' and Robbins' reliance on these plans was negligent, and resulted in an erroneously large calculation of the home's square footage. Plaintiffs further allege Defendants Morris, Robbins, and Merrill Lynch Realty used this erroneous calculation to present the Cox defendants with a CMA inflating the market price of the home to the $510,000–$550,000 range. It is uncontested that the Merrill Lynch multiple listing service entry for the Coxes stated that 132 Carolina Forest contained 4,847 heated square feet, when the home in fact contained only 4,212 heated square feet, as stated in a subsequent listing for the Johns.

Chloe Cox testified she gave the plans to Morris only for the purpose of allowing the Johns to make the plans available to an architect planning additions to the home.[9] The Cox defendants assert they did not give Morris the plans for the purpose of calculating the home's square footage.

While negotiating the purchase of 132 Carolina Forest, the Johns followed Morris' recommendation that they insert a clause in the contract making their obligation to buy the home contingent upon an appraisal demonstrating the home's value to be at least equal to the purchase price. After the Coxes rejected their first two offers, the Johns agreed to pay the Coxes $520,000.00 for the home.

The State Employees Credit Union subsequently requested that appraiser Pam Davis make an appraisal of the house in connection with the Johns' application for a loan to purchase 132 Carolina Forest. Davis contacted Defendant Morris some time in October of 1986 to inform Morris that Davis' calculation of the square footage was 4,212 feet, significantly less than Robbins', and that Davis' appraised value for the home would not equal the value Robbins had previously calculated for the CMA. Plaintiffs assert that David Collins, who represented the State Employees

---

5. *Id.* at 154.

6. *Id.* at 156–57.

7. *Id.* at 29.

8. *Id.* at 157.

9. Deposition of Chloe B. Cox at 36 (Nov. 16, 1989).

Credit Union, refused to allow Robbins to do an appraisal for the home due to Robbins' conflict of interests in the transaction. In addition, Morris wrote in her journal on October 16, 1986, "[I] am sick of David C. saying, 'Don't you pump up an appraisal.'" At some point thereafter, Morris also entered a note in her journal that Davis was becoming hostile due to pressure from Robbins. Plaintiffs allege that Robbins pressured Davis to make her appraisal and square footage measurements more consistent with Robbins' CMA calculations. Sally John testified that Morris called on October 15, 1986, to inform her, "Pam could not get the appraisal to come out close to the purchase price."[10] Sally John further testified she told Morris that, while she simply wanted the house, Tommy John wanted the appraisal to "come up close [to the] purchase price for the business side of it."[11] Morris responded that Robbins could do an appraisal of the home. Morris later called Plaintiffs to inform them Robbins' appraisal was $520,000.00, and represented Davis' lower figures as the result of her "inexperience" and failure to consider the home's Timberline roof and other quality features.[12] The State Employees Credit Union declined to lend Plaintiffs funds to purchase the house.

After notice from Davis that the square footage was less than Robbins had calculated from the home's plans, Morris, Robbins, and McAffee revisited the home and measured it with a 100' tape, graph paper, and a pencil, as is customary in the industry. This measurement revealed the home contained much less square footage than Defendants previously computed from the architectural plans. Plaintiffs allege that the Merrill Lynch Defendants fraudulently suppressed information revealing the house contained only 4,212 square feet in order to induce the Plaintiffs to close on the home.

On or about October 20, 1986, the Johns closed on the purchase of 132 Carolina Forest for $520,000.00, with financing provided by Citizens First National Bank of New Jersey.

After a contract dispute with the University of North Carolina, Tommy John discontinued his employment in Chapel Hill. The Johns re-listed 132 Carolina Forest for sale with Defendants Dorothy Morris and Merrill Lynch Realty. After going unsold for approximately three years, the house sold in March of 1990 for $340,000.00. Plaintiffs state they were not aware of misconduct by Defendants until January of 1989, when they engaged another realtor who apprised them of Defendants' alleged misrepresentations and conflict of interests. Plaintiffs brought suit alleging fraud, negligent misrepresentation, and breach of the fiduciary duty of agency claims against all Defendants, and further alleging unfair and deceptive trade practices claims as to the Merrill Lynch Defendants.

## II. ROBBINS, MORRIS, AND MERRILL LYNCH DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants Robbins, Morris, and Merrill Lynch (the "Merrill Lynch Defendants") move for summary judgment on all claims against them. As explained below, the court will deny the motion as to all claims except Plaintiffs' allegation that the Merrill Lynch Defendants' conflict of interests in the 132 Carolina Forest transaction constituted an unfair and deceptive trade practice.

### A. *Fraud*

■ To make out an actionable case of fraud in North Carolina, Plaintiffs must show (1) that Defendants made a representation relating to some material past or existing fact, (2) that the representation was false, (3) that Defendants knew it was false, (4) that the Defendants made the representation with the intention that it should be acted upon by Plaintiffs, (5) that the Plaintiffs reasonably relied upon the representation and acted upon it, and (6) that the Plaintiffs suffered injury. *Myers & Chapman, Inc. v. Thomas G. Evans,*

10. Deposition of Sally D. John at 100.

11. *Id.* at 102.

12. *Id.* at 103.

*Inc.*, 323 N.C. 559, 568, 374 S.E.2d 385, 391 (1988).

■ Defendants first contend that Plaintiffs cannot show the fifth element necessary to state fraud because Plaintiffs cannot show they reasonably relied upon Defendants' false representations of the square footage of 132 Carolina Forest. Defendants cite *Marshall v. Keaveny*, 38 N.C.App. 644, 248 S.E.2d 750 (1978), for the proposition that a purchaser of a home cannot rely upon the misrepresentation by the sellers as to heated square footage contained in a home where the purchaser "had full opportunity to and in fact did inspect the house and could have determined square footage therein for himself by simple measurements and mathematical computations." 38 N.C.App. at 649, 248 S.E.2d at 753. The court in *Marshall* stated,

> *Absent facts to the contrary made known to the seller at the time of his representations* as to the square footage of a house to be sold, the seller is entitled at this point in the history of public education to assume that his prospective buyer possesses the mathematical skills required for determining the square footage contained in the house. The seller is also entitled to assume that its buyer will make such determination during his actual inspection of the house if he believes it material.

*Id.* at 649, 248 S.E.2d at 754 (emphasis added). Defendants argue that, because Plaintiffs toured the home, Plaintiffs had full opportunity to inspect 132 Carolina Forest and therefore cannot rely on Defendants' representations of square footage.

However, *Marshall* is distinguishable from the instant case. To begin, in *Marshall*, an advertisement listing the home's square footage, to which the buyer responded, included a disclaimer stating, "The above information is believed to be accurate but is subject to verification by the buyer." 38 N.C.App. at 645, 248 S.E.2d

at 752. The available evidence reveals no similar disclaimer here. Furthermore, the court in *Marshall* nowhere stated a seller could properly assume laymen possess the skills to measure the area of an oddly shaped, as opposed to rectangular, house. In fact, Defendant Morris answered that she never measured a contemporary home and has never represented herself as able to do so. Morris also testified that she "would have someone else measure" such "contemporary houses with angles." [13] These statements indicate that Morris, a licensed real estate broker, lacked the skills needed to measure an oddly shaped contemporary home like 132 Carolina Forest. Robbins, managing agent of Merrill Lynch Realty in Chapel Hill and also a licensed real estate broker, testified he relied on the architectural plans to calculate the square footage for 132 Carolina Forest "because of the many [triangular] offsets on the house.... that were very difficult to measure. I daresay if you sent five people out there today to measure it, you'd come back with five different answers. It's an extremely difficult house to measure." [14]

The court fails to see the logic in assuming that laymen have the skills needed to measure a contemporary house with triangular offsets like 132 Carolina Forest when professionals in the trade would face significant difficulties measuring the same home. Though an essentially rectangular house may be susceptible of "simple measurements and mathematical computations," Morris testified that measuring this contemporary home required graph paper, a 100′ measuring tape, a measurement of the exterior walls, knowledge of distinctions between spaces that are customarily excluded from or included in the calculations, the ability to draw the house to scale, and the further ability to "square off" the drawing so as to "figure the square footage." [15] This action therefore differs from *Marshall v. Keaveny*, where the court rea-

---

**13.** Deposition of Dorothy S. Morris at 36 (Nov. 16, 1989).

**14.** Deposition of A.C. Robbins at 26–27 (Nov. 17, 1989).

**15.** Deposition of Dorothy S. Morris at 38–39.

soned, "There is no indication ... that the plaintiff was any less able to make a determination as to square footage than [the real estate agent]." 38 N.C.App. at 650, 248 S.E.2d at 754.

Morris and Robbins knew upon preparing the CMA that measuring the home was a difficult task even for a licensed real estate broker. At the time they made representations to Plaintiffs as to the home's square footage, the Defendants thus knew of facts negating the assumption under *Marshall* that prospective buyers possess the skill necessary to properly measure the home. Consequently, the Merrill Lynch Defendants cannot rely on the assumption articulated in *Marshall* to assert Plaintiffs' reliance on the alleged misrepresentations of square footage was unreasonable.

Defendants also contend that Plaintiffs' alleged reliance on Defendants' representations of square footage was not reasonable because Plaintiffs made no additional investigation of the square footage although both Plaintiffs had at least two opportunities to inspect 132 Carolina Forest. The court in *Marshall* stated this position as follows: "The plaintiff here did not rely upon the representations of [the real estate agent] or any other representations ... to such extent as to forego making his own investigation.... There is no indication from the record on appeal ... that any representation was made to [the purchaser] which caused him to reasonably forego measuring the house." 38 N.C.App. at 650, 248 S.E.2d at 754. Defendants argue that Plaintiffs' failure to inquire negates the element of reasonable reliance required to show fraud.

But, in noting the "more tolerant attitude" courts have taken toward plaintiffs alleging reasonable reliance upon fraudulent statements of the acreage in a land transaction, the court in *Marshall v. Keaveny* explained,

The science of surveying land and determining the acres contained within boundaries, which frequently create forms unknown to the students of geometry, remains beyond the abilities of the ordinary buyer in sales of real property....

[O]ur courts have properly imposed upon sellers of real property a requirement that any representation they make, as to acreage of a tract with which they are more familiar than the buyer ... be correct and that they be bound by such representations.

38 N.C.App. at 648, 248 S.E.2d at 753.

Measuring a contemporary home with triangular offsets is not, of course, a task identical to measuring oddly shaped acreage. Nonetheless, to the layman unschooled in techniques of the trade, measuring such a home might more closely resemble measuring an oddly shaped parcel of land than measuring a simple, rectangular house. As the court in *Marshall* also stated, "[T]he point at which reliance ceases to be reasonable and becomes such negligence ... that it will ... bar recovery is difficult to determine and, in close cases, should be resolved in favor of the party alleging reasonable reliance upon fraudulent misrepresentations." 38 N.C.App. at 649, 248 S.E.2d at 754. Further, on motions for summary judgment the court must consider the facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

The court does not intend to suggest there are no issues surrounding Plaintiffs' duty to inquire which warrant further scrutiny at trial. Indeed, such issues may ultimately control Defendants' liability to Plaintiffs. The court rules merely that such issues are not properly resolved on summary judgment. The apparent difficulty of measuring a home with intricate angles, coupled with statements from Plaintiffs' advisor Morris as to the home's square footage, present questions of fact bearing on Plaintiffs' duty under the circumstances to inquire further into the home's area.

The Merrill Lynch Defendants next argue their failure to disclose to Plaintiffs prior to closing that Defendants' second measurement of the home, which Defendants conducted after notice from Davis that 132 Carolina Forest contained only

4,212 square feet, revealed much less square footage than represented to Plaintiffs cannot be fraud as a matter of law. Defendants note that, at the time Defendants became aware of their error in square footage, Plaintiffs had already made an offer to purchase contingent only upon an appraisal demonstrating the home's value to be at least equal to the purchase price. Defendants insist the only fact then material to this sales contract, and therefore material to the transaction as a whole, was whether the home's appraised value was equal to its price. Defendants thus argue that square footage was not material to Plaintiffs at the relevant time, and Defendants' failure to disclose the house contained only 4,212 square feet cannot meet the element of materiality necessary to state fraud under *Myers & Chapman. See* 323 N.C. 559, 568, 374 S.E.2d 385, 391 (1988).

This court is unaware of, and Defendants have not cited, any precedent confining the material facts of a real estate transaction to the contingent terms of an offer to purchase. On the contrary, in *Homelite v. Trywilk Realty Co.,* the court stated that a representation is material under North Carolina law where "the fact ... wrongfully suppressed if it had been known to the party [would have] influenced his judgment or decision in entering the contract." 272 F.2d 688, 691 (4th Cir.1959). The Johns stated that they required a home of at least 5,000 square feet to accommodate adequately their family of six. The square footage of 132 Carolina Forest, which Plaintiffs allege Defendants suppressed, was therefore material to this transaction. For the above reasons, the court will deny the Merrill Lynch Defendants' motion for summary judgment on Plaintiffs' fraud claim.

### B. *Negligent Misrepresentation*

Plaintiffs' negligent misrepresentation claim is based on Morris' and Robbins' use of the Coxes' architectural plans to measure the square footage.

North Carolina has adopted the *Restatement of Torts* definition of negligent mis-

representation. *Stanford v. Owens,* 76 N.C.App. 284, 286, 332 S.E.2d 730, 731–32, *review denied,* 314 N.C. 670, 336 S.E.2d 402 (1985). That definition provides:

One who in the course of his business or profession supplies information for the guidance of others in their business transactions is subject to liability for harm caused by their reliance upon information if (a) he fails to exercise that care and competence in obtaining and communicating the information which its recipient is justified in expecting, (b) the harm is suffered (i) by the person or one of the class of persons for whose guidance the information was supplied, and (ii) because of his justifiable reliance upon it in a transaction in which it was intended to influence his conduct or in a transaction substantially identical therewith.

*Id.; see Restatement (Second) of Torts* § 552 (1977).

Defendants contend that, for the same reasons that Plaintiffs cannot show the reasonable reliance required to state a fraud claim for misrepresentation of square footage, Plaintiffs also cannot show the "justifiable reliance" necessary under subsection (b)(ii) of the definition to state a negligent misrepresentation claim. The court agrees that both fraud and negligent misrepresentation claims require the same element of "reasonable" or "justifiable" reliance. Nevertheless, for reasons previously stated, the court rejects Defendants' argument that Plaintiffs can show no set of facts establishing this element. The Merrill Lynch Defendants' motion for summary judgment will be denied as to Plaintiffs' negligent misrepresentation claim.

### C. *Breach of the Fiduciary Duty of Agency*

Plaintiffs make two distinct claims of breach of fiduciary duty. The first claim alleges the Merrill Lynch Defendants had conflicting interests in the 132 Carolina Forest transaction. The second alleges Defendants breached an agent's duty to disclose all facts material to a transaction.

The Merrill Lynch Defendants make a three-part argument that Plaintiffs' first

claim of Defendants' conflict of interests is unfounded. Defendants first contend that a principal-agent relation has not been established between Plaintiffs and the Merrill Lynch Defendants. Second, were an agency relationship established, Defendants assert their position as both the buyers' and sellers' agent in the transaction was legal on the facts of this case because Defendants disclosed to Plaintiffs their position as the sellers' agent. Third, Defendants contend that summary judgment is proper because Plaintiffs have failed to show any damage resulting from an alleged breach of duty.

 Defendants first note that they had no written agreement with the Johns to act as their real estate agent. However, a contract to act as a real estate broker does not require a written instrument. *See Thompson–McLean, Inc. v. Campbell*, 261 N.C. 310, 313, 134 S.E.2d 671, 674–75 (1964). "Where some evidence is presented of an agency relationship, agency is a fact to be proved and a question for the jury." *Johnson v. Hunnicutt*, 86 N.C.App. 405, 411, 358 S.E.2d 74, 77 (1987). Agency can be proved " 'by any fact or circumstances with which the principal can be connected and having a legitimate tendency to establish that the person was his agent for the performance of the act in controversy.' " *Colony Assocs. v. Fred L. Clapp & Co.*, 60 N.C.App. 634, 638, 300 S.E.2d 37, 39 (1983) (quoting *Smith v. Kappas*, 218 N.C. 758, 765, 12 S.E.2d 693, 698, *modified on other grounds*, 219 N.C. 850, 15 S.E.2d 375 [1941] ). Defendant Morris requested that the Johns resist the pleas of other "real estate agents" seeking to represent the Plaintiffs. Plaintiffs testified they subsequently worked exclusively with Morris, confided in Morris as to their "bottom line," and communicated to Morris a "price range" of "about $500,000." Plaintiffs di-

rected Morris in her efforts to find them a suitable home in Chapel Hill. Morris anticipated that if she succeeded in locating the home they purchased and performed in a fashion acceptable to the Johns she would be compensated with a percentage of the Johns' "price range." Evidence of the degree necessary under *Johnson* to create a jury question on the issue of agency is present, and summary judgment on the matter is therefore improper.

The Merrill Lynch Defendants next assert that they breached no agent's fiduciary duty to Plaintiffs because they did not violate Section 93A–6(a)(4) of the General Statutes of North Carolina. Section 93A–6(a)(4) provides:

> The [North Carolina Real Estate] Commission shall have the power to suspend or revoke ... a license or to reprimand or censure any licensee, if ... the Commission adjudges the licensee to be guilty of ... (4) acting for more than one party in a transaction without the knowledge of all the parties for whom he acts.

N.C.Gen.Stat. § 93A–6(a)(4) (1989).

In ruling that the trial court properly directed a verdict for defendant in an action alleging unfair and deceptive trade practices in violation of Section 75–1.1 of the General Statute of North Carolina, the court in *Abernathy v. Ralph Squires Realty Co.* stated,

> Plaintiffs contend ... [defendant agent] acted without their knowledge for both the buyer and seller of the house, thereby violating [section] 93A–6(a)(4).... This problem, however, exists in many real estate transactions. In the absence of any evidence that the defendants knowingly and willfully negotiated the sales price for the plaintiffs we can find nothing *deceptive or unfair* in this practice.[16]

---

16. The court in *Abernathy* continued, "The concept of unfair and deceptive trade practices has been an elusive one in [North Carolina] courts." *Abernathy*, 55 N.C.App. at 357, 285 S.E.2d at 327. The North Carolina Supreme Court has stated,

> What is an unfair and deceptive trade practice usually depends on the facts of each case and the impact the practice has in the market-

place.... A practice is [deceptive and] unfair when it offends established public policy as well as when a practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

*Johnson v. Phoenix Mut. Life Ins. Co.*, 300 N.C. 247, 262–63, 266 S.E.2d 610, 621 (1980) (citations omitted).

55 N.C.App. 354, 358, 285 S.E.2d 325, 327 (1982) (emphasis added). Defendants cite *Abernathy* to argue that they did not violate Section 93A–6(a)(4) because they did not negotiate the sales price of 132 Carolina Forest for Plaintiffs. And because they did not violate Section 93A–6(a)(4), Defendants assert they had no conflicting interests in the transaction and did not breach their fiduciary duty of agency to Plaintiffs.

■ However, the court in *Abernathy* did not apply Section 93A–6(a)(4) to determine if a violation of fiduciary duty arose. Rather, the court merely mentioned the section briefly in determining there was no evidence sufficient to show defendant's conduct met the "elusive" definition of unfair and deceptive trade practices. *See Abernathy*, 55 N.C.App. at 357, 285 S.E.2d at 326–27. This court may, of course, apprise itself of Section 93A–6(a)(4) in resolving the instant motion. However, the court will not apply Section 93A–6(a)(4) directly to the facts of this case. Section 93A–6(a) enumerates acts for which the North Carolina Real Estate Commission may, after an appropriate hearing, discipline a licensed real estate broker. *See* N.C.Gen.Stat. § 93A–6(a) (1989). A state administrative agency thus invokes Section 93A–6(a)(4) pursuant to the performance of a judicial function. The General Assembly did not intend Section 93A–6(a)(4) to be initially applied by a federal court,[17] although both state and federal courts may review Commission actions under Section 93A–6(a)(4) after such actions are concluded.[18] *See Amsley v. West Virginia Racing Comm'n*, 378 F.2d 815, 816–17 (4th Cir.1967).

For additional guidance as to the duties a real estate broker owes his principal, this court looks to North Carolina common law. The court in *Kim v. Professional Business Brokers Ltd.* stated, "It is now well settled that a broker representing a purchaser or seller in the purchase of real property owes a fiduciary duty to his client based upon the agency relationship itself." 74 N.C. App. 48, 51–52, 328 S.E.2d 296, 299 (1985). The court in *Spence v. Spaulding & Perkins, Ltd.* further stated,

[a broker's] duty includes a legal ... responsibility to secure for the principal the best bargain in terms that his skill, judgment and diligence can obtain. A broker has a duty not to conceal from his principals any material information and to make full, open disclosure of all such information.

82 N.C.App. 665, 667, 347 S.E.2d 864, 865–66 (1986) (citation omitted).

■ The court is aware that a buyer's advisor is usually compensated with a percentage of the property's purchase price. To the extent this practice constitutes an industry norm, Defendants may argue that Plaintiffs had tacit disclosure that Morris would receive the usual buyer's advisor commission from the sellers. However, whether a certain practice constitutes a trade custom or usage is ordinarily a question of fact to be determined by the fact finder. *E.g., Superior Foods, Inc. v. Harris–Teeter Super Markets, Inc.*, 288 N.C. 213, 225, 217 S.E.2d 566, 575 (1975). Furthermore, the Plaintiffs' advisor Morris received an additional commission for acting also as the sellers' listing agent in the 132 Carolina Forest transaction. The Merrill Lynch Defendants offer no evidence demonstrating that a buyer's advisor's receipt of additional compensation for simultaneously acting as the seller's agent is a sufficiently common arrangement that the court may imply the buyer's knowledge thereof when ruling on a motion for summary judgment.

■ To address this matter, Defendants argue that at some point after July

---

17. Under Section 93A–7 of the same chapter, a court of record may *recommend* to the Commission that a broker's license be revoked whenever a party files suit claiming the party was damaged by the gross negligence, incompetency, fraud, dishonesty, or misconduct of the broker. *See* N.C.Gen.Stat. § 93A–7 (1989).

18. Accordingly, the only court decisions interpreting Section 93A–6(a)(4) are judicial reviews of Commission actions revoking brokers' licenses for violating the section. *See Correll v. Boulware*, 74 N.C.App. 631, 329 S.E.2d 695 (1985); *North Carolina Real Estate Licensing Bd. v. Gallman*, 52 N.C.App. 118, 277 S.E.2d 853 (1981).

31, 1986, when Morris told Plaintiffs, "We have the listing [for 132 Carolina Forest]," she made full disclosure of her position as sales agent for the Coxes. Defendants contend this statement was disclosure sufficient to preclude a claim for breach of the fiduciary duty of agency based on a conflict of interests. This argument does not persuade the court. In the present context, the pronoun "we" is susceptible of varying interpretations. Plaintiff Sally John testified that she understood the term "we" to mean that Merrill Lynch Realty had the listing for 132 Carolina Forest and did not understand the term to include Morris as the actual sales agent for the Coxes.[19] Defendants, of course, argue that the term "we" necessarily included Morris. Whether the pronoun "we" adequately disclosed to Plaintiffs that Morris was also acting as sales agent for the Coxes is a question of fact for trial.

■■■ Finally, Defendants argue that the Plaintiffs cannot recover on the conflict of interests claim since they state no damages proximately flowing from the alleged breach of duty. However, Plaintiffs' complaint seeks approximately $77,887.00 as damages for the alleged fifteen per cent (15%) misrepresentation in square footage, various damages relating to Plaintiffs' purchase of the home, and any other damages proximately caused by the alleged breaches of Defendants. Plaintiffs have shown that they bought 132 Carolina Forest, and have also shown that the Merrill Lynch Defendants had interests adverse to their interests in the transaction. A reasonable fact finder could determine that Plaintiffs would not have proceeded in the transaction, at least in the fashion that they did, had they known Morris was the sales agent for the Coxes. A fact finder could thus determine Plaintiffs were damaged as a result of Defendants' alleged breach of duty.

For the above reasons, the Merrill Lynch Defendants' motion for summary judgment will be denied with respect to said Defendants' alleged conflict of interests in the 132 Carolina Forest transaction.

19. Deposition of Sally D. John at 153–57.

■■■ The Merrill Lynch Defendants respond to Plaintiffs' second claim for breach of fiduciary duty by contending that, even after entering into a formal listing agreement with the Plaintiffs on January 21, 1987, to resell the house, Defendants remained under no duty to disclose to Plaintiffs that the house contained only 4,212 square feet. Defendants acknowledge that this agreement made them the agents of the Plaintiffs and that they were obligated to disclose all material facts to their principals, the Johns. Nevertheless, Defendants urge summary judgment on this breach of duty claim, arguing that the size of the house was not a material fact to the Plaintiffs, that the correct square footage was listed in the multiple listing service and was therefore public information available to Plaintiffs, and that Plaintiffs can show no damage resulting from Defendants' failure to communicate the square footage to them. The court rejects each of these arguments in turn. First, interpreting the facts in the light most favorable to the non-moving party, the court cannot say the square footage would not be material to the Plaintiffs. On the contrary, the available evidence suggests the square footage would be very material to Plaintiffs in ascertaining an appropriate sales price for the home. For example, Defendants previously calculated, albeit erroneously, the square footage of the home in order to prepare a comparative market analysis and a range of listing prices for the Coxes. Plaintiffs would likely have a similar material interest in ascertaining the true area of 132 Carolina Forest in order to set a realistic resale price for the home. Second, as Defendants acknowledge, a broker has a fiduciary duty "to disclose *to the transferor* all material facts." *Link v. Link*, 278 N.C. 181, 192, 179 S.E.2d 697, 704 (1971) (emphasis added). Defendants may not evade their duty to communicate directly to their principals simply by demonstrating the material information was otherwise available to the Johns. Third, Plaintiffs claim that, "Due to the deception

caused by the Defendants, the Plaintiffs['] house remained on the market for an over-priced amount of money."[20] Plaintiffs seek "[i]nterest and other payments made on the house since date of purchase" and "[a]ny ... damages which are proximately caused by the various breaches of the Defendants."[21] After re-listing in January 1987, 132 Carolina Forest remained unsold until March 1990. Plaintiffs incurred carrying costs during this three-year period as a consequence of their prolonged effort to resell the home. On motion for summary judgment, the court therefore cannot say the Plaintiffs can show no damages resulting from the alleged breach. For the above reasons, Defendants' motion for summary judgment on the alleged breach of an agent's duty to disclose will be denied.

D. *Unfair and Deceptive Trade Practices*

Defendants also move for summary judgment on Plaintiffs' claim of unfair and deceptive trade practices. To state this claim, Plaintiffs re-allege their claims for fraud, negligent misrepresentation, and breaches of fiduciary duty of agency, and further allege that such acts are in violation of North Carolina General Statutes § 75–1.1. Section 75–1.1(a) provides, "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C.Gen.Stat. § 75–1.1(a) (1988).

1. Fraud and negligent misrepresentation as the claim for unfair and deceptive trade practices

■■■ The court in *Powell v. Wold* stated in a case of fraud and negligent misrepresentation claims against a realtor, "[I]f the plaintiffs can prove fraud, which ... they have properly alleged, ... they will have proved unfair and deceptive trade practices." 88 N.C.App. 61, 68, 362 S.E.2d 796, 800 (1987). The court in *Powell* consequently reversed dismissal of the unfair

and deceptive trade practices claim where it had determined plaintiffs' underlying fraud and negligent misrepresentation claims were sustainable. *Id.* This court previously determined that the Johns have alleged fraud and negligent misrepresentation claims sufficient to withstand summary judgment. Therefore, Plaintiffs' claim for unfair and deceptive trade practices also survives Defendants' motion for summary judgment because its foundation is Plaintiffs' claims for fraud and negligent misrepresentation.

2. Breaches of the fiduciary duty of agency as the claim for unfair and deceptive trade practices

■■■ The court's disposition of the motion for summary judgment is different with respect to the unfair and deceptive trade practices claim where the underlying claim is conflict of interests in the sales transaction as a breach of the fiduciary duty of agency. In determining the trial court properly directed a verdict for defendant in a claim for unfair and deceptive trade practices, the court in *Abernathy v. Ralph Squires Realty Co.* stated, "Plaintiffs contend that ... [defendant agent] acted without their knowledge for both the buyer and the seller of the house, thereby violating [section] 93A–6(a)(4).... [but] [i]n the absence of any evidence that defendant knowingly and willfully negotiated the sales price for the plaintiffs, we can find nothing deceptive or unfair in this practice." 55 N.C.App. 354, 358, 285 S.E.2d 325, 327 (1982).

As explained before, this court will not apply Section 93A–6(a)(4) directly to the facts of this action. Nevertheless, the court need not apply Section 93A–6(a)(4) to find *Abernathy* controlling in the context of an unfair and deceptive trade practices claim based on an alleged conflict of interests. Plaintiffs have nowhere alleged or shown evidence that Defendants negotiated the sales price of 132 Carolina Forest for them. As Plaintiffs fail to make any show-

---

**20.** Amended Complaint ¶ 123 (filed Feb. 1, 1990).

**21.** *Id.* at ¶¶ 133, 141.

ing of this essential element of the claim, summary judgment on Plaintiffs' claim of unfair and deceptive trade practices based upon an alleged conflict of interests is proper. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

■ As for Plaintiffs' allegation that Defendants' failure to disclose square footage upon re-listing the house for them was a breach of the fiduciary duty of agency, now re-alleged as a claim for unfair and deceptive trade practices, the court again observes that a real estate agent is under a duty to make full disclosure to his principal of all material facts. *See Spence v. Spaulding & Perkins Ltd.*, 82 N.C.App. 665, 667, 347 S.E.2d 864, 865–66 (1986). This court has already determined that square footage appears to be a material fact which Defendants had a fiduciary duty to disclose in their capacity as re-listing agent for Plaintiffs. In emphasizing a broker's fiduciary duty to his principal, the court in *Starling v. Sproles* ruled a broker committed an unfair and deceptive act in violation of Section 75–1.1 where he failed to disclose to the principal before buying the principal's property that a third party had made an offer to purchase the same property. 66 N.C.App. 653, 311 S.E.2d 688 (1984). Viewing the facts in the light most favorable to the non-moving party, the court sees no reason to distinguish between an agent's duty to disclose square footage in the instant case and the duty to disclose the third-party offer in *Starling*. Consequently, Plaintiffs' allegation that the Merrill Lynch Defendants failed to disclose the square footage of the home states a claim for unfair and deceptive trade practices sufficient to withstand Defendants' motion for summary judgment.

## III. THE COX DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

By separate motion, the Cox Defendants move for summary judgment on claims arising from their own conduct and on addi-

tional claims of vicarious liability for the alleged wrongful acts of the Merrill Lynch Defendants. The available evidence reveals two acts by the Cox Defendants which could plausibly establish liability independent of the Merrill Lynch Defendants' conduct: (1) Chloe Cox's delivery of the architectural plans for 132 Carolina Forest to Morris, and (2) her alleged statement to Plaintiffs that the home contained "about 5,000 square feet."

Plaintiffs make no claim of vicarious liability against the Coxes for the alleged unfair and deceptive trade practices of the Merrill Lynch Defendants. Thus, the issues before the court are whether to grant the Cox Defendants' motion for summary judgment on Plaintiffs' claims against the Coxes for fraud and negligent misrepresentation, and whether to grant summary judgment on claims the Coxes are vicariously liable for the alleged fraud, negligent misrepresentation, and breach of agent's fiduciary duty of the Merrill Lynch Defendants. The court will grant summary judgment on the claim that the Coxes are directly liable for fraud and on the claims that the Coxes are vicariously liable for the Merrill Lynch Defendants' alleged negligent misrepresentation and breach of the fiduciary duty of agency, and will deny summary judgment on the remaining claims.

### A. *Chloe Cox's Statement of Square Footage*

■ While the available evidence indicates that 132 Carolina Forest contained only 4,212 square feet, Tommy John testified that Chloe Cox told Plaintiffs that the home contained "about 5,000 square feet of living space." [22] Sally John also testified that Cox's exact words were, "It's got 5,000 square feet of living space." [23] The Cox Defendants deny making this statement.

#### 1. Fraud

The Cox Defendants contend that Plaintiffs have failed to allege that Chloe Cox

---

**22.** Deposition of Thomas E. John, Jr., at 93.

**23.** Deposition of Sally D. John at 30.

had the element of scienter necessary to commit fraud. Even "[a]ssuming that the alleged statement was made with reckless indifference to the truth or recklessly made without knowledge," Defendants assert that Plaintiffs nevertheless have not alleged that Cox had the intent to deceive which is required to constitute fraud. The only claim Plaintiffs make with respect to Chloe Cox's intent is that she stated, "the house contained 5,000 square feet ... without really knowing the facts." [24]

If Plaintiffs seek to state a fraud claim based on Cox's alleged misrepresentation, they are evidently relying upon an overruled definition of fraud under which making "the representation recklessly without any knowledge of its truth" sufficed as the intent element of the claim. *See Odom v. Little Rock & I–85 Corp.*, 299 N.C. 86, 92, 261 S.E.2d 99, 103 (1980). However, in disavowing the definition of *Odom*, the court in *Myers & Chapman, Inc. v. Thomas G. Evans, Inc.* ruled that fraud requires that the defendant know the representation is false and have the specific intent to deceive. 323 N.C. 559, 568, 374 S.E.2d 385, 391 (1988). Plaintiffs do not allege Cox knew the statement was false nor that she intended to deceive the Johns. The court accordingly will grant the Cox Defendants' motion for summary judgment on the fraud claim.

## 2. Negligent misrepresentation

▪ Defendants note that, when questioned as to the area of the home, Chloe Cox allegedly told Plaintiffs the home contained about "5,000 square feet of *living space*." [25] Defendants contend that "5,000 square feet" is an accurate statement of the total "living space," as distinguished from the 4,212 heated square feet, contained in the house. Defendants thereby argue that no misrepresentation resulted from Cox's statement.

Defendants cite no precedent defining the term "living space," as used within the real estate industry, to be a term separate and distinct from "heated square feet." In addition, the court is aware of no such precedent.[26] However, the layman home buyer would not be unjustified in believing that "living space" means heated square footage, as one would not normally "live" in unheated spaces such as a garage during the cooler months of the year. Moreover, on motion for summary judgment, the court must consider the facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Whether the term "living space" negligently misrepresented the heated square footage of the home is a question for trial.

The Cox Defendants' remaining contentions raise the same arguments regarding the reasonableness of Plaintiffs' reliance on square footage representations as were rejected in the Merrill Lynch Defendants' motion. Summary judgment on the negligent misrepresentation claim against the Cox Defendants will be denied.

## 3. Parol evidence rule

▪ Defendants further argue the parol evidence rule bars extrinsic evidence of promises concerning the square footage of 132 Carolina Forest in interpreting the parties' Offer to Purchase Agreement. Defendants contend the sales contract was a total integration of all terms material to the agreement. Since the contract contained no reference to heated square footage, Defendants argue that Plaintiffs are prevented from offering proof of any of Defendants' prior negotiations or representations.

However valid Defendants' argument might be for contract claims, Plaintiffs do not sue on the contract. Fraud and negli-

---

**24.** Amended Complaint ¶ 98 (filed Feb. 1, 1990).

**25.** Deposition of Thomas E. John, Jr., at 93 (emphasis added).

**26.** Indeed, the only clue as to what the Cox Defendants intended by the term "living space" is found in the following portion of Thomas E. John's deposition: "Q: Did [Chloe Cox] at any time tell you that to her living space meant heated square footage? A: As opposed to garages, decks, pools, pool houses, ... no, she did not." Deposition of Thomas E. John, Jr., at 94.

gent misrepresentation are claims sounding in tort. And as the court in *Marshall v. Keaveny* explained, "[A]n action for fraudulent misrepresentations inducing the plaintiff to enter a contract is an action in tort, not an action in contract, and the rule that prior conversations and negotiations are merged into the writing does not apply." 38 N.C.App. 644, 647, 248 S.E.2d 750, 753 (1978). Another case which the Defendants themselves cite, *Raritan River Steel Co. v. Cherry, Bekaert & Holland,* further describes "[t]he *tort* of negligent misrepresentation." 322 N.C. 200, 206, 367 S.E.2d 609, 612 (1988) (emphasis added). The parol evidence rule simply does not apply to the tort claims alleged here.

### B. *The Cox Defendants' Vicarious Liability for the Alleged Wrongful Acts of the Merrill Lynch Defendants*

The Coxes admit they entered into a listing agreement with the Merrill Lynch Defendants which made the Merrill Lynch Defendants the Coxes' sales agent for 132 Carolina Forest. Nevertheless, the Coxes contend they are not vicariously liable for the alleged fraud, negligent misrepresentation, and breach of the fiduciary duty of agency of the Merrill Lynch Defendants. The court addresses each of these contentions below.

#### 1. Vicarious liability for the alleged fraud of the Merrill Lynch Defendants

The Cox Defendants note that the court in *Vaughn v. N.C. Dept. of Human Resources* observed, "[A] principal is not vicariously liable for the tortious acts of an agent who is not subject to the control and direction of the principal with respect to the details of the work and is subordinate only in *effecting a result* in accordance with the principal's wishes." 296 N.C. 683, 686, 252 S.E.2d 792, 795 (1979) (emphasis in original). The court in *Vaughn* nonetheless proceeded to rule the Department of Human Resources retained sufficient control over the County Director of Social Services to be liable for his negligent acts under the rule of *respondeat superior.* 296 N.C. 683, 690–91, 252 S.E.2d 792, 797.

Defendants rely on the *Vaughn* court's observation to argue that they did not retain sufficient control and direction over the Merrill Lynch Defendants to incur vicarious liability for the alleged fraud of those defendants. Defendants also cite *Blackwell v. Dorosko,* 95 N.C.App. 637, 638, 383 S.E.2d 670, 671 (1989), for the same proposition in the context of a real estate transaction. Even assuming that *Blackwell* is consistent with North Carolina Supreme Court decisions addressing a principal's liability for actions of his real estate agent, the court finds *Blackwell* distinguishable from the instant action. The court of appeals in *Blackwell* based its decision on a failure of the evidence to demonstrate "that plaintiffs ever met with [the] defendant [vendor] ... or that [defendant] ever made any representations to plaintiffs," and the failure of the evidence to demonstrate that the defendant "exercised any control over the realtors who brokered the sale" of his condominium. *Id.* at 638, 383 S.E.2d at 671. Here, in contrast, the defendant Chloe Cox met with Plaintiffs, and in fact conducted the Johns and Morris on a tour of the house during which she represented a number of details about the property. To the extent Cox conducted this tour and directed Morris and the Johns within the home, she also contributed to the means by which her agent Morris sold 132 Carolina Forest. Thus the instant action differs from *Blackwell* in that the vendor Cox communicated directly with the Plaintiffs and appears to have exercised some control over the agent Morris.

Moreover, North Carolina decisions have generally ruled the principal is liable for the fraudulent acts of his real estate agent. For example, Justice Parker (later Chief Justice), writing for a unanimous court in *Norburn v. Mackie,* said,

> The general rule is that a principal is responsible to third parties for injuries resulting from the fraud of his agent committed during the scope of the agent's actual or apparent authority from the principal, even though the principal did not know or authorize the commission of the fraudulent acts.

262 N.C. 16, 23, 136 S.E.2d 279, 284–85 (1964).

In *Norburn,* plaintiff alleged that the vendor's agent misrepresented that the farm which plaintiff subsequently purchased contained 500 acres of pasture land when the farm actually contained less than 200 acres of pasture land. 262 N.C. 16, 136 S.E.2d 279 (1964). The supreme court determined that the evidence raised a jury question as to whether a purchaser who had informed the vendor's agent that he would be required to rely on the agent's representations was entitled to damages from the principal for the misrepresentation. *Id.* at 24, 136 S.E.2d at 285.

In addition, without requiring that the principal control the details of his real estate agent's work, the court of appeals in *Vickery v. Olin Hill Constr. Co.* stated, "If the jury should find that plaintiffs were injured by the fraudulent representations of [Hill's agent], then ... Hill, as principal[ ], must be held answerable for the fraudulent acts of the[ ] agent." 47 N.C. App. 98, 101–02, 266 S.E.2d 711, 714 (1980) (citing *Norburn v. Mackie, supra* ). The court ruled that the property owner could be liable for the agent's acts where plaintiffs alleged they dealt with the defendant property owner through an agent, and the agent misrepresented to plaintiffs that a parcel of property which plaintiffs purchased included a driveway plaintiffs saw when inspecting the property. *Id.* at 103, 266 S.E.2d at 714–15.

In view of this pertinent case law, the court is not persuaded by the Cox Defendants' argument that, as principal, they were required to exercise greater control over the details of the Merrill Lynch Defendants' work before becoming liable for the latter's alleged fraud. Summary judgment on the issue of vicarious liability for the alleged fraud of the Merrill Lynch Defendants will be denied.

2. Vicarious liability for the alleged negligent misrepresentation of the Merrill Lynch Defendants

The Johns' pleadings indicate that the only basis of their claim that the Coxes are vicariously liable for the negligent misrepresentation of the Merrill Lynch Defendants is Morris' and Robbins' use of the architectural plans for 132 Carolina Forest to calculate the home's square footage.[27] However, Chloe Cox testified she gave Morris the architectural plans for 132 Carolina Forest only to allow the Plaintiffs to make the plans available to an architect proposing additions to the house.[28] The Cox Defendants contend their express purpose in giving the plans to Morris relieves them of vicarious liability for any misrepresentations of the home's area resulting from the Merrill Lynch Defendants' allegedly negligent measurement of the plans. Under North Carolina law,

[L]iability of a principal for the torts of his agent may arise in three situations: (1) when the agent's act is expressly authorized by the principal; (2) when the agent's act is committed within the scope of his employment and in furtherance of the principal's business; or (3) when the agent's act is ratified by the principal.

*Hogan v. Forsyth Country Club Co.,* 79 N.C.App. 483, 491, 340 S.E.2d 116, 121, *review denied,* 317 N.C. 334, 346 S.E.2d 140 (1986). Plaintiffs offer no testimony contradicting Chloe Cox, and there is no evidence suggesting that the Coxes expressly authorized the Merrill Lynch Defendants to measure the plans in order to calculate the square footage of the home. Furthermore, the principal "is not liable if the employee departed, however briefly, from his duties to accomplish a purpose of his own." *Hogan,* 79 N.C.App. 483, 491, 340 S.E.2d 116, 121. Plaintiffs themselves alleged that Morris' and Robbins' use of the plans to compute square footage was not the "ordinary custom in the trade." [29] In the absence of the Coxes' express authorization to do so, Morris' and Robbins' mea-

---

**27.** *See* Amended Complaint, ¶¶ 52, 53, 59, 62, 97, 99, 100 (filed Feb. 1, 1990).

**28.** Deposition of Chloe B. Cox at 36.

**29.** Amended Complaint ¶ 58 (filed Feb. 15, 1990).

surement of the plans therefore cannot fall within the scope of their employment with the Coxes, and cannot be viewed as in furtherance of the Coxes' business. Finally, there is absolutely no evidence that the Coxes ever ratified Morris' and Robbins' measurement of the plans. In sum, there is no evidence from which one could find the Coxes vicariously liable for the alleged negligent misrepresentations of square footage resulting from the Merrill Lynch Defendants' faulty measurement of the architectural plans. Summary judgment on this claim is appropriate. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

 3. Vicarious liability for the alleged breach of agent's fiduciary duty of the Merrill Lynch Defendants

The Cox Defendants also contend that they cannot be vicariously liable for the Merrill Lynch Defendants' alleged breach of fiduciary duty of agency since one cannot be vicariously liable for the acts or omissions of a person who is the agent of another party. Because the Merrill Lynch Defendants allegedly breached the fiduciary duty arising from their status as Plaintiffs' agent, Defendants argue, no vicarious liability can extend to the Cox Defendants for this breach.

 Despite the intuitive appeal of the Cox Defendants' argument, an agent can be in the service of two principals simultaneously, provided both have the right to exercise some measure of control, and there is common or joint participation in the work and benefit to each from its rendition. *See Sharpe v. Bradley Lumber Co.,* 446 F.2d 152 (4th Cir.1971), *cert. denied,* 405 U.S. 919, 92 S.Ct. 946, 30 L.Ed.2d 789 (1972). The mere fact that the Merrill Lynch Defendants may have acted simultaneously as agents for the Plaintiffs does not completely eliminate the potential vicarious liability of the Coxes.

 However, applying the aforementioned rules from *Hogan v. Forsyth Country Club Co., supra,* to the instant facts demonstrates there is no basis for the Cox Defendants' vicarious liability for the Mer-

rill Lynch Defendants' alleged breach of the fiduciary duty of agency. Plaintiffs do not allege, and there is no evidence from which one might infer, that the Cox Defendants expressly instructed the Merrill Lynch Defendants to breach a fiduciary duty to Plaintiffs. And, as the Cox Defendants point out, Plaintiffs allege that the Merrill Lynch Defendants breached their fiduciary duty while acting as Plaintiffs' agent. Therefore, the alleged breach could not have occurred within the scope of the Merrill Lynch Defendants' employment with the Coxes. Finally, there is no evidence that the Cox Defendants ever ratified the alleged breach of duty. In conclusion, there is no evidence which would allow one to find the Cox Defendants vicariously liable for the alleged breach of the Merrill Lynch Defendants' fiduciary duty to Plaintiffs. *See Hogan v. Forsyth Country Club Co.,* 79 N.C.App. at 491, 340 S.E.2d at 121. Summary judgment on this claim will be granted.